THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| JOHN DOE, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | 8:09CV456 |
| vs. | ) | |
| | ) | |
| STATE OF NEBRASKA, et al., | ) | |
| | ) | **FINDINGS OF FACT,** |
| Defendants. | ) | **CONCLUSIONS OF LAW**, |
| _____ | ) | **AND MEMORANDUM** |
| | ) | **AND ORDER** |
| JOHN DOE, | ) | |
| | ) | 4:10CV3266 |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| NEBRASKA STATE PATROL, | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |
| | ) | |
| JOHN DOE, | ) | |
| | ) | 4:10CV3005 |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| STATE OF NEBRASKA, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

Earlier I paraphrased Justice Oliver Wendell Holmes and observed that if the people of Nebraska wanted to go to hell, it was my job to help them get there.[1]  By that, I meant that it is not my prerogative to second-guess Nebraska's policy judgments so long as those judgments are within constitutional parameters.  Accordingly,  I upheld many portions of Nebraska's new sex offender registration laws even though it was my firm personal view that those laws were both wrong-headed and counterproductive.

However, I had serious constitutional concerns about three sections of Nebraska's new law.  After careful study, I granted summary judgment regarding one claim and decided that a trial was necessary to resolve my other concerns.  The trial has now been concluded, and I have decided that the remaining portions of Nebraska's sex offender registry laws are unconstitutional.

In short, I can only help Nebraskans get to the figurative hell that Holmes spoke of if they follow a constitutional path.  For three sections of Nebraska's new sex offender registry law, Nebraska has violently swerved from that path.  I next explain why that is so.

---

[1]Filing 92, Case No. 8:09CV456, Memorandum and Order on Motion for Preliminary Injunction, at CM/ECF p. 18 (citing Oliver Wendell Holmes, Jr., as quoted in Ronald K.L. Collins, *As Justice Holmes said . . . Oliver Wendell Holmes Jr. on free speech & related matters: selected quotations*, First Amendment Center (May 21, 2008) (letter to Harold Laski, May 13, 1919) at http://www.firstamendmentcenter.org/ (last accessed August 29, 2012)).

# I. STATUTES AT ISSUE & PRIOR OPINION ON SUMMARY JUDGMENT MOTIONS

## A.    *Statutes at Issue*

Plaintiffs[2] challenge the constitutionality—both facially and as applied—of parts of three statutes:  Neb. Rev. Stat. §§ 29-4006(1)(k) and (s), 29-4006(2), and 28-322.05 (West, Operative Jan. 1, 2010).  Generally, sections 29-4006(1)(k) and (s) require disclosure by persons required to register under the Nebraska Sex Offender Registration Act of remote communication device identifiers, addresses, domain names, and Internet and blog sites used; section 29-4006(2) requires registrants to consent to the search and installation of monitoring hardware and software; and section 28-322.05 criminalizes some registrants' use of social networking web sites, instant messaging, and chat room services accessible by minors.

In relevant part, these statutes provide:

Neb. Rev. Stat. § 29-4006(1)(k) and (s):

> (1)    Registration information required by the Sex Offender Registration Act shall be entered into a data base in a format approved by the sex offender registration and community notification division of the Nebraska State Patrol and shall include, but not be limited to, the following information:
>
>        . . . .

---

[2]The numbered Doe plaintiffs are offenders required to register under the Nebraska Sex Offender Registration Act and the lettered Does are family members or people having "some connection with a Doe."  (Transcript of Trial 36:2-8 ("Tr.").)  The transcript of trial may be found at Filings 516-520.

(k)   The person's remote communication device identifiers and addresses, including, but not limited to, all *global unique identifiers*, serial numbers, *Internet protocol addresses*, telephone numbers, and account numbers specific to the device;[3]

. . . .

(s)   All email addresses, instant messaging identifiers, chat room identifiers, *global unique identifiers*, and other Internet communication identifiers that the person uses or plans to use, all domain names registered by the registrant, and all blogs and Internet sites maintained by the person or to which the person has uploaded any content or posted any messages or information.[4]

Neb. Rev. Stat. § 29-4006(2):

(2)   When the person provides any information under subdivision (1)(k) or (s) of this section, the registrant shall sign a consent form, provided by the law enforcement agency receiving this information, authorizing the:

(a)   Search of all the computers or electronic communication devices possessed by the person; and

(b)   Installation of hardware or software to monitor the person's Internet usage on all the computers or electronic communication devices possessed by the person.

---

[3]The parties have stipulated in the Order on Final Pretrial Conference that the italicized language is "overbroad and unduly burdensome." (Filing 492 at CM/ECF p. 2 ¶ 6.)

[4]The parties have stipulated in the Order on Final Pretrial Conference that the italicized language is "overbroad and unduly burdensome." (Filing 492 at CM/ECF p. 2 ¶ 6.)

4

Neb. Rev. Stat. § 28-322.05:

(1)   Any person required to register under the Sex Offender Registration Act who is required to register because of a conviction for one or more of the following offenses, including any substantially equivalent offense committed in another state, territory, commonwealth, or other jurisdiction of the United States, and who knowingly and intentionally uses a social networking web site, instant messaging, or chat room service that allows a person who is less than eighteen years of age to access or use its social networking web site, instant messaging, or chat room service, commits the offense of unlawful use of the Internet by a prohibited sex offender:

(a)   Kidnapping of a minor pursuant to section 28-313;

(b)   Sexual assault of a child in the first degree pursuant to section 28-319.01;

(c)    Sexual assault of a child in the second or third degree pursuant to section 28-320.01;

(d)   Incest of a minor pursuant to section 28-703;

(e)   Pandering of a minor pursuant to section 28-802;

(f)   Visual depiction of sexually explicit conduct of a child pursuant to section 28-1463.03 or 28-1463.05;

(g)   Possessing any visual depiction of sexually explicit conduct pursuant to section 28-813.01;

(h)   Criminal child enticement pursuant to section 28-311;

(i)   Child enticement by means of an electronic communication device pursuant to section 28-320.02;

(j)   Enticement by electronic communication device pursuant to section 28-833; or

5

(k)     An attempt or conspiracy to commit an offense listed in subdivisions (1)(a) through (1)(j) of this section.

(2)     Unlawful use of the Internet by a prohibited sex offender is a Class I misdemeanor for a first offense.  Any second or subsequent conviction under this section is a Class IIIA felony.

Relevant definitions are found in Neb. Rev. Stat. § 29-4001.01:[5]

(3)     Chat room means a web site or server space on the Internet or communication network primarily designated for the virtually instantaneous exchange of text or voice transmissions or computer file attachments amongst two or more computers or electronic communication device users;

. . . .

(10)   Instant messaging means a direct, dedicated, and private communication service, accessed with a computer or electronic communication device, that enables a user of the service to send and receive virtually instantaneous text transmissions or computer file attachments to other selected users of the service through the Internet or a computer communications network;

. . . .

(13)   Social networking web site means a web page or collection of web sites contained on the Internet (a) that enables users or subscribers to create, display, and maintain a profile or Internet domain containing biographical data, personal information, photos, or other types of media, (b) that can be searched, viewed, or accessed by other users or visitors to the web site, with or without the creator's permission, consent,

---

[5]I previously decided that the definitions in this section apply to the criminal statute being challenged, section 28-322.05, because "the criminal provisions . . . and the definitions . . . were contained in the same legislation."  (Filing 354 at CM/ECF p. 29 n.29.)

6

invitation, or authorization, and (c) that may permit some form of communication, such as direct comment on the profile page, instant messaging, or email, between the creator of the profile and users who have viewed or accessed the creator's profile . . . .

## B.   *Prior Opinion*

In my prior memorandum and order addressing the parties' motions for summary judgment (Filing 354), I determined that the plaintiffs' facial and as-applied challenges to the above-cited statutes raised four constitutional concerns that necessitated a trial—namely, issues arising under the First Amendment, the Due Process Clause, the Ex Post Facto Clause, and the Fourth Amendment.

With regard to the First Amendment, I decided that trial was necessary as to sections 29-4006(1)(k) and (s) and 28-322.05 to determine whether the requirement that sex-offender registrants disclose information about Internet use violates their right to freedom of speech guaranteed by the First Amendment and the Nebraska equivalent and whether the partial ban on Internet use by certain offenders, upon pain of criminal conviction, violates those speech rights as well.  I noted that the parties had not presented an undisputed record of material facts that "explains how these two statutes would actually work in practice and without such a record I cannot determine the implications of this statute on Plaintiffs' First Amendment rights."  (Filing 354 at CM/ECF p. 35.)

Similarly, I reserved for trial the issue of whether section 28-322.05 is void for vagueness under the Due Process Clause and Nebraska's equivalent provision because the parties failed to present a sufficient factual record to show how this statute works. Thus, I could not determine whether the statute provides fair notice of what is prohibited and whether a limiting construction could be applied to save the statute. (Filing 354 at CM/ECF pp. 32-33.)

7

As to Plaintiffs' claim under the Ex Post Facto Clause, I decided that a trial was necessary to determine whether sections 29-4006(1)(k) and (s), 29-4006(2), and 28-322.05 violate that clause of the United States Constitution and the Nebraska equivalent for offenders (1) who had served their time and were no longer under criminal justice supervision as of the effective date of the laws, January 1, 2010, and (2) who had been sentenced prior to January 1, 2010, but remained under criminal justice supervision on or after that date.  (Filing 354 at CM/ECF p. 11.)

Finally, I decided that the consent-to-search and consent-to-monitoring[6] provisions of Neb. Rev. Stat. § 29-4006(2) are unconstitutional under the Fourth Amendment and the Nebraska equivalent, Neb. Const. art. I, § 7, as to the plaintiffs who were previously convicted of sex crimes but who were not on probation, parole, or court-monitored supervision on or after January 1, 2010.  (Filing 354 at CM/ECF pp. 15-27.)  However, I reserved for trial the issue of the constitutionality of Neb. Rev. Stat. § 29-4006(2) under the Fourth Amendment and the Nebraska Constitution as to those who were previously convicted of sex crimes and who were on probation, parole, or court-monitored supervision on or after January 1, 2010, as well as those persons associated with them.  (*Id.*)

## II.  FINDINGS OF FACT

### A.    *Legislative History*

The challenged legislation originated in LB 97 and LB 285, which the Nebraska Legislature passed and the Governor approved in May 2009.  Among other things, LB 97 amended Neb. Rev. Stat. § 29-4006 to add the search-and-monitoring provision (now § 29-4006(2)) and to add information that sex-offender registrants must report

---

[6]Counsel for the defendants acknowledged that the constitutionality of the consent-to-monitoring provision as to sex offenders who were no longer on probation or parole was "a first[-]impression issue."  (Filing 354 at CM/ECF p. 18.)

to the Nebraska State Patrol (now § 29-4006(1)(s)). LB 97 also created two new statutes—Neb. Rev. Stat. §§ 28-322.05 (criminalizing unlawful use of the Internet by a prohibited sex offender) and 29-4001.01 (definitional section). *See* Nebraska Laws, LB 97, §§ 14, 24, 26 (2009). LB 285 amended Neb. Rev. Stat. § 29-4006 to add what is now section 29-4006(1)(k) and amended sections 14 and 24 of LB 97. *See* Nebraska Laws, LB 285, § 7 (2009).

The Nebraska Attorney General's Office was the principal drafter and editor-in-chief of LB 97, which that office brought to Nebraska Senator Scott Lautenbaugh for introduction. (Ex. 156, Attorney General's 2009 Legislative Package; Ex. 301, Judiciary Committee Transcript at pp. 1-2, 4 (Mar. 11, 2009); Ex. 301, Floor Debate at p. 2 (Apr. 22, 2009).) Assistant Attorney General Corey O'Brien was the principal architect of LB 97, and in December 2008, he indicated in an e-mail to Senator Lautenbaugh that although he "would personally like to prevent [persons with prior sex offenses] from using the internet altogether, that would be unconstitutional. However, depriving them from accessing certain parts of the internet is perfectly constitutional." (Ex. 199.)

The Introducer's Statement of Intent for LB 97, which included Neb. Rev. Stat. § 28-322.05, states that it was intended to "protect children from sexual predators by strengthening penalties and bringing Nebraska's laws up to date." (Ex. 301, Introducer's Statement of Intent.) During the Judiciary Committee session on March 11, 2009, Senator Lautenbaugh stated:

> [LB 97] was brought to me by the Attorney General's Office, and as I think I said at the outset on this, I am not sure if I'm the ideal senator to be introducing this or not, because I have sort of a . . . this area is very troubling to me, and it provokes kind of a rage and maybe a lack of perspective that I probably shouldn't have as the sponsor of this bill or probably should have the perspective as sponsor of the bill. . . . [T]his is an area that I have trouble basically dealing with and processing in my own mind. . . . And as I indicated before, I have to confess to a certain

9

revulsion, and I don't think this sets me apart when we discuss people who have these convictions.  And these are ongoing restrictions, and it is good to believe in rehabilitation, and the fact that people can change.  In this area, I don't buy that.  I don't think that anyone who thought this was a good idea once actually changes their view on it.

(Ex. 301, Judiciary Committee Transcript at pp. 1-2, 12 (Mar. 11, 2009).)

During the Nebraska Legislature's discussion of the scope of the search-and-monitoring provisions, Senator Lautenbaugh admitted that "some of the provisions in here do seem harsh and restrictive and that's really the point. . . .  for individuals with these particular proclivities and these particular past convictions, we do want to limit and track what they're using the Internet for to avoid a repeat offense."  (Ex. 301, Floor Debate Regarding LB 97 at p. 6 (Apr. 22, 2009).)  In his concluding remarks, Senator Lautenbaugh stated:

I questioned whether or not I was the ideal person to bring this [bill], because of the just revulsion I feel for people who have these convictions.  Revulsion is not too strong a word.  I mean these are not criminals that we're angry at.  These are people that are just frightening to me and all of us, and I think rightfully so, and I don't have a lot of faith in our ability to rehabilitate people who would engage in this type of conduct.

(Ex. 301, Floor Debate Regarding LB 97 at p. 18 (Apr. 22, 2009).)

### B.  *The Doe Plaintiffs & Experts*

The parties stipulate that all plaintiffs are required to register under Nebraska's Sex Offender Registration Act and are subject to the provisions of Neb. Rev. Stat. §§ 29-4001 to 29-4014, with the exception of John and Jane Does B and D-K.  The parties further stipulate that these plaintiffs are required to register under Nebraska's Sex Offender Registration Act because of a conviction for one or more of the offenses

10

enumerated in Neb. Rev. Stat. § 28-322.05(1)(a)-(k): John Does 2, 3, 4, 6, 12, 13, 17, 18, 19, 24, 27, 35. Finally, the parties stipulate that the following plaintiffs committed one or more of the offenses in section 28-322.05(1)(a)-(k) by means of a computer or electronic communications device: John Does 2, 3, 12, 17, 24. (Filing 492 at CM/ECF p. 2.)

Ten of the plaintiffs participating in this case testified at trial, as well as the plaintiffs' expert. Their testimony is summarized below.

### 1.   *Professor David Post*

For the past 15 years, Professor David G. Post has taught at Temple University's law school, specializing in copyright, trademark, other intellectual property law, and cyberlaw. (Tr. 66:19-67:4.) Prior to his position at Temple, Post twice worked as a law clerk for now United States Supreme Court Justice Ruth Bader Ginsburg; worked for more than six years at a large Washington, D.C., law firm in intellectual property and "high-tech transactions" involving software developers and systems integrators; and taught at Georgetown for three years. (Tr. 69:19-70:23.) Post has published several law journal articles and a law school casebook concerning the Internet and its legal ramifications. (Tr. 67:8-68:24.)

Post testified that Neb. Rev. Stat. § 28-322.05 and the statutory definitions for "chat room," "instant messaging," and "social networking web site" in Neb. Rev. Stat. § 29-4001.01 are ambiguous, and that these definitions either cover "almost everything on the Net" or "might cover virtually nothing on the Internet," depending upon how the terms are interpreted. (Tr. 74:17-21.)

Specifically, Post testified that a "broad reading" of the definition of "chat room" in section 29-4001.01 could include "ordinary telephone service," cellular telephone service, e-mail, and SMS text messages, as well as more conventional chat rooms that fall "clearly within the bull's-eye" of the statutory definition. (Tr.

11

84:7-85:25.) For example, "when I send you an e-mail—an ordinary electronic mail with text and maybe a file attachment, I think as a perfectly reasonable reading of the statute that we are now engaged in a chat room interaction because there's server space on the Internet that is designated for the instantaneous exchange of texts amongst the two of us." (Tr. 85:7-13.) Further, because *Amazon.com*, for example, "has server space that is designated for the instantaneous exchange of text between two or more computer users," it would also qualify as a chat room under the statute. (Tr. 86:8-17, 118:23-119:12.) Post acknowledged that a chat room allows "one-to-one communication and one to many" amongst those who are "in the room." (Tr. 112:21-25.)

Post also testified that the definition of "instant messaging" in Neb. Rev. Stat. § 29-4001.01(10) could include only "old-fashioned telephone" service if the statutory language "direct, dedicated, and private communication service" means "a line of a physical piece of wire that is dedicated to our communication [which is] the way that the telephone system actually works." Alternatively, this language could include "virtually all electronic communication" if interpreted to mean "communication[] that's not publicly accessible but is only accessible to the participants." (Tr. 92:1-22.) Post stated that instant messaging is "any system that allows one-to-one communication via text," which would include *Google*, *Gmail*, *Hotmail*, *Facebook*, *Yahoo Messenger*, *Wikipedia*, and *YouTube* because these services allow the "virtual instantaneous transfer of texts and computer file attachments." (Tr. 93:16-94:17, 120:9-13.) Post thinks use of the word "direct" in the statutory definition of instant messaging is confusing because "anything that's traveling over the Internet . . . . gets broken up into tiny pieces [and] . . . converge[s] virtually instantaneously on your machine later." (Tr. 123:4-25.) Post's "guess is" that the Nebraska Legislature was "trying to capture a sort of private one-to-one nature of conversation as opposed to one to many or many to one." (Tr. 124:19-25.)

Post testified that the definition of "social networking web site" in section 29-4001.01(13) has a "threshold statutory ambiguity" caused by use of the term

12

"collection of web sites" because that phrase "could cover everything that is on the World Wide Web because the World Wide Web is itself a collection of web sites." (Tr. 95:1-24.)

> Even if you take that definition, read it a little more narrowly, you still have things like Google.com. Google.com—you type in Google.com to your browser and it comes up with a search page, the familiar page. That page doesn't have profile information on it. I can't enter my profile on that page but I can enter a . . . searchable profile on any number of pages that are linked to the Google web page so I can go from the Google.com page to Blogger, to Gmail, to YouTube . . . and in one click I'm at a site where I can have a searchable profile that viewers can access. So . . . even though [Google.com] does not have this functionality, is it part of a collection of web sites that has this functionality, and I think the answer is, yeah, it is because . . . I know that they're in the same collection of web sites. Blogger is owned by Google so I suppose that makes it part of the same collection. It's one link away from Google so it's part of a collection. . . . [T]he Google.com site encourages you to go to Blogger, to go to YouTube. . . . [T]o me as a user . . . when I'm at the Google.com page, . . . I'm in a collection of web sites that has this functionality so the Google.com page is a social networking web site. Even though it does not have this functionality, it's part of the collection that does.

(Tr. 96:8-97:9.)

Aside from the "collection of web sites" issue, Post stated that the "functionality" described in this statute is the ability "to create a . . . searchable profile. If I can create a searchable profile that others can comment on or communicate with me, they can find my profile and send me a message of some kind," then it is a social networking web site within the meaning of section 29-4001.01(13). (Tr. 95:13-17.) This definition would encompass "many commercial sites that wouldn't ordinarily think of themselves as social networking but they have this functionality," such as *Amazon.com*, *L.L. Bean*, *Blogspot*, and *WordPress*. (Tr.

13

97:16-99:8.)  All of these sites have "a way for you to post your profile and talk to other users."  (Tr. 98:22-23.)

Regarding the language in section 28-322.05(1) that prohibits sex offenders from using a social networking web site, instant messaging, or chat room service "that allows a person who is less than eighteen years of age to access or use" it, Post does not know of "any instant messaging services that even purport to keep minors out. Same for chat rooms."  (Tr. 77:19-23, 78:23-79:4.)  Further, Post testified that anyone of any age can "access" a site, if only to read the site's terms and conditions.  (Tr. 78:1-16.)

Post testified regarding the reporting requirement in section 29-4006(1)(s) of "all blogs and Internet sites . . . to which the person has uploaded any content or posted any messages or information."  Post testified that "cookies files" are being invisibly uploaded to web sites people visit "hundreds of times . . . daily as you're . . . making your way around the Net."  These text files—which contain information identifying when you last visited a web site and what you did there—"are being deposited on [an Internet user's] machine and then sent to the web sites from their machine the next time they go visit and that could be considered the uploading of content" within the meaning of the statute.  (Tr. 108:20-109:24.)

In Post's opinion, the combined effect of the statutes at issue (depending upon how they are interpreted) could bar individuals from: (1) communicating via text message since every commercially available text messaging system could plausibly be classified as "instant messaging" under Neb. Rev. Stat. § 29-4001.01(10) and no text messaging systems prohibit minors' access; (2) communicating via cellular or landline telephone with any third party; (3) reading any blogs or online newspapers if those sites allow users to identify themselves and communicate with others via a "comments" or "discussion" functionality; (4) joining any discussion groups, listservs, or online communities; and (5) purchasing goods or services online from any site

14

allowing user "ratings" and comments.  (Ex. 304, Expert Report of David G. Post at pp. 18-19.)

## 2.    *Does 17 & F*

Doe 17 is employed by his father, Doe F, and he installs and maintains video conferencing systems and runs an online training business.  Doe 17 serves as the operations manager, helping to manage public rental of the business's video equipment, as well as installing video conferencing systems for clients off-site.  (Tr. 285:1-287:15.)  These systems use the Internet and server space, they operate virtually instantaneously, they transmit voice files, and they use hardware in the form of a CPU or electronic communication device.  (Tr. 287:15-291:12.)  They are also private.  (Tr. 292:1-4.)   Therefore, when Doe 17 performs a diagnostic check on a video conferencing system he installs, he believes he is using an instant messaging system and chat room within the meaning of the statutes at issue.  (Tr. 291:16-25.)

Because Doe F and Doe 17 sometimes work from separate locations—the business's office and Doe F's home office—they often use *Google Talk* instant messenger to communicate with one another, although they also frequently talk by phone.  (Tr. 293:8-14, 315:1-14.)  They also communicate via text messaging and an IP-based phone system for convenience and cost reasons.  (Tr. 293:20-294:3, 316:5-10.)  Doe 17 regularly uses e-mail in both businesses.  (Tr. 299:21-25.)  Doe 17 maintains his Cisco certification through that company's web site, which requires him to create an account, give personal identifying information, review lessons, and take tests.  The Cisco web site also allows one to communicate with a Cisco customer service representative or technician via e-mail and live chat and with others through help forums and blogs.  (Tr. 294:4-295:11.)

Doe 17 uses chat rooms and instant messaging systems for his personal online training business, but he avoids using an industry-related online forum on the topic of video conferencing called *VC Talk* because users must create a profile, users have

15

the ability to communicate with other users, the site has "an age limit of 13," and he is "trying to . . . in good faith comply with the current law." (Tr. 295:18-299:16.) He has built web sites for clients that he believes may qualify as "social networking web sites" or "instant messaging" within the meaning of the statutes at issue. (Tr. 300:2-21.)

Doe 17 testified that if Neb. Rev. Stat. § 28-322.05 were applied to him, his business would shut down and he would be relegated to fewer job duties than when he was on parole because he would be prevented from answering the Internet-based phone and he could not provide training because "the method of doing training is remote training all over the web. It all involves audio and text chat." (Tr. 303:2-305:1.)

He frequently interfaces with law enforcement because he is required to update his Internet identifying information regularly because he has many web sites that he maintains for clients that require him to "upload[] data" and he "constantly" needs access to technical forums to "do new research on new issues." (Tr. 308:18-309:13.) Doe F testified that Doe 17 was integral to his small business. (Tr. 326:2-327:22.) According to Doe F, if section 28-322.05 were applied to Doe 17, Doe F would have to terminate his son's employment, and Doe F could not pass the business on to his son. (Tr. 330:6-9, 332:3-16.)

### 3.    *Doe 35*

While Doe 35 does not use computers, cell phones, instant messaging, or chat rooms in the course of his work, he regularly texts his wife during the day, and occasionally his mother. (Ex. 211 at 10:20-12:4, 14:6-16.) He maintains a *Facebook* account to keep up with old friends. (Ex. 211 at 12:13-15, 15:16-16:8.)

16

### 4.   *Doe 31*

In his current occupation, Doe 31 provides remote desktop and server support for one client, which involves basic hardware and software troubleshooting. (Tr. 341:20-342:6.) To do his job, Doe 31 must access his client's computers remotely, which allows him to share computer files back and forth and access the Internet on others' computers. (Tr. 343:4-24.) Although his job frequently requires him to access vendor web sites by creating a profile with a user name and password, Doe 31 has never used the chat capabilities that are available on those web sites. (Tr. 344:16-346:21, 350:19-23.) Doe 31 does not post any information on web sites for either work-related or personal reasons, but he e-mails and texts family and uses a cell phone for personal and business reasons. (Tr. 351:1-352:13.)

### 5.   *Doe 21*

Doe 21 is the president of a music retail company and wholesaler. (Tr. 353:22.) Doe 21 uses e-mail, *Google Chat*, and text messaging to communicate with customers internationally. (Tr. 354:21-355:25.) He admitted that providing his e-mail addresses and online identifiers under Neb. Rev. Stat. § 29-4006(1)(k) and (s) has not affected his ability to conduct business. (Tr. 356:14.)

### 6.   *Doe 3*

Doe 3 is self-employed, running a business that sells and installs high-end car audio and video equipment and other vehicle accessories. (Tr. 360:5-15.) He has operated the business for almost two years. (Tr. 368:20-21.) He purchases inventory from online vendors through e-mail, telephone, and vendor web sites, and some of these vendor web sites require creation of a profile. (Tr. 360:21-361:6.) He also visits manufacturer web sites that allow him to communicate with the manufacturer via e-mail from the web site. (Tr. 365:7-20.)

17

Doe 3 conducts much of his business through car audio forums, including contacting new global clients. (Tr. 361:20-362:9.) For example, he uses *DIYMA.com* (Do It Yourself Mobile Audio), which permits a person to create a profile, search and view another's profile, and allows some form of communication; it also allows direct messaging functions between users. (Tr. 362:15-363:3.) Doe 3 uses these forums to solicit business, find information, and ask and answer technical questions. (Tr. 363:16-24.) These forums do not require users to prove their age in order to log in or use them. (Tr. 372:22-373:4.) Doe 3 uses these forums at least once per day as his primary source of technical data, and he uses other forums "all the time . . . throughout the day." (Tr. 364:8-22.) If he were banned from these forums, he would not be able to access the full range of technical information needed or consult with car audio experts. (Tr. 373:5-17.)

Doe 3 is able to take credit card payment over the phone by having an account with the Internet-based company called *Square.com*, which requires him to have a profile, user name, and password, but does not allow him to communicate with other users. He also uses *Craigslist* to advertise and sell items for his business, as well as *Facebook*, a cell phone, text messaging, and e-mail. (Tr. 366:20-368:7, 374:8-11.)

For the type of high-end business he runs, his client base is not the local market. (Tr. 363:4-13, 373:19-374:7.) As Doe 3 put it, the impact of Neb. Rev. Stat. § 28-322.05 would be fatal if it meant he were banned from the forums: "[I]t would basically not allow me to . . . continue the business because there isn't [sic] enough . . . customers located in our area to support this business." (Tr. 365:24-366:4.)

Doe 3 uses e-mail, text messaging, and web site access to communicate with his wife and children, as well as for things like his kids' basketball league, for which "all the information comes via e-mail. Looking up the schedule of games is on a web site. None of this information is hard copy anymore. Everything's electronic." (Tr. 369:6-370:7.)

18

7.    *Doe 19*

Doe 19 registers in Lancaster County as a transient because his sound and light company and his coach company require him to leave Nebraska regularly to go on tours with entertainers.  (Tr. 379:10-380:4.)  He has operated his businesses since 2006 and 2008, respectively.  (Tr. 389:5-9.)  He uses text messaging and e-mail to keep in touch with tour managers, his partners, and his assistant; to send out bids to potential clients; and for personal communication.  (Tr. 382:7-383:13.)  Doe 19 has not used social networking because it is "nerve-wracking with all this going on."  (Tr. 384:20-21.)  He is also concerned that the mere use of these mediums is criminal.  (Tr. 385:6-386:2.)  He testified that he has not used social networking sites like *MySpace* and *Facebook*, but he needs to do so because he is "losing out because anybody that's got a band or a management company has a *Facebook* or a *MySpace*. . . .  All bands, all artists use that."  (Tr. 384:2-385:5.)  Doe 19's potential clients use social networking "to advertise themselves and to also find people to fill their roles whether it be for sound and lighting or coaches or whatever."  (Tr. 384:5-8.)

Doe 19 has abstained from setting up a *Twitter* account.  (Tr. 389:13-15.)  He testified that if Neb. Rev. Stat. § 28-322.05 prohibited e-mail or texting, it "would sink" his business because "[n]obody would know about me.  There is no way to communicate. . . . [S]nail mail isn't done anymore in that kind of business so I would literally starve to death trying to find clients."  (Tr. 386:24-387:9.)

8.    *Doe 18*

Doe 18 has significant experience with both computer hardware and computer software.  (Tr. 390:20-392:9.)  He currently operates a computer consulting business, including removing computer viruses, upgrading hardware and software, and providing on-call support.  (Tr. 392:10-20.)  He communicates with clients via cell phone calls, texts, and e-mail.  If a customer sends an e-mail to his cell phone, it appears as a text message on his phone, but his reply will appear as an e-mail to the

19

client—"[i]t's technical convergence.  It's . . . getting harder and harder to separate the things."  (Tr. 393:4-17.)

Doe 18 gains remote access to problem computers using the program *LogMeIn*, which has the capability to allow him to chat via text with the person on the other computer and to transfer computer files.  (Tr. 394:2-395:1.)  He uses manufacturer web sites to obtain technical assistance, such as the web sites for Lexmark, Dell, and IBM.  (Tr. 396:25-397:5.)  All of the manufacturer web sites permit some form of chat function, and he has used the chat function on the Lexmark web site to obtain technical data from a person of unknown age, gender, or location.  (Tr. 397:6-398:4.)

Similar to Doe 3, Doe 18 uses online forums, such as *Bleeping Computer*, to get assistance with technical problems.  He is concerned that such sites might be considered social networking web sites within the meaning of the Nebraska statutory scheme.  For example, *Bleeping Computer* allows one to sign up and register an account, to maintain a profile page, to view or gain access to another's profile page, and to communicate with others in a forum.  (Tr. 396:1-17, 398:5-399:2.)  Doe 18 has refrained from getting *LinkedIn* , *Facebook*, and *Twitter* accounts because he does not know "how the law stands on that."  He is also concerned about using links and forums on various technical web sites because "it's not always clear where you're going"; he "may not be . . . in the public area of that company web site . . . if they haven't secured their internal company information"; and he may "stumble into what might be considered a social networking web site" under Nebraska law.  (Tr. 395:2-15, 400:11-22, 401:13-21, 402:19-403:9.)

Doe 18's "limited presence on the Internet" has limited his work and is "odd" for a computer consulting business.  "If you don't have a presence on the Internet, you don't have a company basically speaking."  (Tr. 395:2-18, 403:10-20.)  If Neb. Rev. Stat. § 28- 322.05 prohibited Doe 18 from using forums and manufacturer web sites, it would be difficult, if not impossible, to resolve the virus and other in-depth problems he encounters in his computer consulting business.  (Tr. 401:19-402:5.)

4:09-cv-03266-RGK-CRZ   Doc # 217   Filed: 10/17/12   Page 21 of 73 - Page ID # 3977

Further, if he were unable to use a cell phone or text message, it would "significantly impact" his relationships with his family, friends, and church.  (Tr. 403:21-405:1.) Doe 18 earns 80 percent of his income performing construction remodeling because he cannot generate enough income through his computer consulting business due to his "very small digital presence. . . . the work doesn't just spontaneously occur."  (Tr. 408:4-13, 409:13-410:8.)

### 9.    *Doe 2*

Doe 2 develops Internet-based applications for his employer.  (Tr. 412:16-21.) His employer has "intranet," which is a company-specific social networking site used only by employees.  (Tr. 413:22-415:13.)  This site is "only one step removed from what *Facebook* does" and allows users to generate a profile, get and use a user name and password, access others' profiles, and electronically communicate with other employees.  Doe 2's employer hires interns who are under 18 years old.  (Tr. 414:5-23, 441:12-15.)  He collaborates with other employees in New York and Wisconsin using this medium (Tr. 415:4-10), as well as through an Internet-based phone service (Voice-over IP), *WebEx* (which contains "an instant message type of a chat"), *GoToMeeting*, and instant messaging.  (Tr. 416:6-418:23.)  Doe 2 uses "a few hundred" online forums to post technical questions and answers.  (Tr. 420:11-423:9.) These sites require you to create a profile and some of them allow users to talk to each other "through personal messages."  (Tr. 422:23-423:6.)

In addition to his employment, Doe 2 also runs a computer programming and consulting business, including web site design.  (Tr. 423:15-425:10.)  For some of the web sites he has developed, he is the "guy on the other end" of the "chat window" who assists others.  (Tr. 424:17-425:1.)  He frequently uses e-mail and text messaging for his consulting work, and 10 to 15 percent of his work is done through instant messaging.  (Tr. 425:11-426:8, 442:19-25.)  Doe 2 uses *LogMeIn*, *Remote Desktop Protocol*, *pcAnywhere*, *GoToMyPC*, and a virtual private networking product by Cisco to gain remote access to clients' computers.  (Tr. 419:2-420:6, 426:16-427:5.)

21

If Neb. Rev. Stat. § 28-322.05 prohibited Doe 2 from using social networking, such as his company internal web site, instant messaging, or chat room systems, he does not believe his consulting business could survive, and he is not sure how he could function as an employee since his co-workers are in other parts of the country. (Tr. 427:9-428:3, 431:21-433:22.)  By not using *Facebook* and *Twitter*, Doe 2 is "really struggling because [he] just can't pull people in."  (Tr. 430:10-24.)

Doe 2 also uses *eBay* and *Amazon* to purchase household items and books for his college-aged children, as well as Internet news sites and sites related to sex-offender laws.  (Tr. 433:5-22, 439:4-6.)  There are several devices in Doe 2's home that connect to the Internet, including several computers, a Blu-ray player, Xbox products (which allow users to connect with other users), and iPods.  (Tr. 437:9-438:25.)

### 10.   *Doe 24*

Doe 24 is on the Nebraska sex-offender registry due to a 2005 conviction for online enticement of a minor and a sentence imposed in 2006 for one year and a day. He was not put on probation or parole for that offense.  (Tr. 471:3-25.)  Doe 24 was sentenced to 3 to 6 years for a drug offense in October 2010 and was paroled on March 27, 2012.  Doe 24's conditions of parole require him to "obey all . . . laws, ordinances and orders" and "permit [his] parole officer and/or personnel of Parole Administration to conduct routine searches of [his] person, residence, vehicle or any property under [his] control, at such times as they deem necessary."  (Tr. 450:15-24 & Ex. 210.)  Doe 24 is not subject to a special condition of parole that would have required him to "consent to unannounced examination (search) of any and all computer(s) and/or devices to which you have access to."  (Ex. 210 at p. 6.)

Doe 24 has a bachelor of science degree in business administration with a focus on management information systems, databases, and entrepreneurship, and he was previously employed as a consultant where he "would either go on site or remotely

access [clients'] computers or their servers and resolve any . . . IT need."  To gain this remote access, Doe 24 used the Internet and often communicated with "chat features."  (Tr. 454:15-25, 455:12-456:25.)  He "had full access to router switches, firewalls, servers, desktops, laptops, anything that was connected to the Internet or their network."  (Tr. 457:19-23.)

### 11.   *Doe 12*

Doe 12 operates a specialized software development and computer consulting company for clients around the world.  (Tr. 489:10-13.)  Because he has clients in Europe, Asia, and South America, he communicates via chat rooms and instant messaging because it would be cost-prohibitive otherwise.  (Tr. 490:23-491:9.)  He uses *Skype* on a daily basis, which permits communication via typed text, voice-over IP, and video-over IP, as well as *AOL Instant Messenger*, *Yahoo*, and *Google Talk*.  (Tr. 490:23-491:9.)  Doe 12 has authored technical books in his field, and as a result has an author page on *Amazon*.  (Tr. 496:15-498:6.)  *Amazon* allows a person to view his author web site, allows him to view a profile page of another *Amazon* user, and permits some form of communication between these two profiles.  (Tr. 498:7-18.)  As with a number of the other Does, he participates in online forums, both as a consumer and as a "guru" providing expert technical data in response to questions.  (Tr. 500:2-501:4.)

Doe 12 testified about how difficult it is, from a user's perspective, to know what system or protocol (SMS or Internet) is being used to communicate.  For example, when Doe 12 telephones his brother in California, it rings on his brother's computer via *Skype*, leading to the question "where does the phone system end and the Internet and *Skype* begin?"  Similarly, a group SMS text sent through Doe 12's Verizon account will automatically convert into an Internet-based MMS (multimedia) message "because Verizon just decided to . . .  do that."  (Tr. 535:25-537:17.)  Doe 12's daughter's cell phone allowed her to "text using SMS to a particular number and then by proxy it would post it off to *Twitter* but the primary mechanism for all of the

different clients, whether it be on the web or on my phone . . . is over the Internet Protocol." (Tr. 535:14-23.)  In Doe 12's view, *Twitter* falls within the definition of "social networking web site" in Neb. Rev. Stat. § 29-4001.01(13).

When Doe 12's step-daughter and wife were in Wisconsin for two months because of a medical problem, he and his family members used videoconferencing and "most of these technologies" to keep in touch.  (Tr. 521:1-16.)  He also stated that if Neb. Rev. Stat. § 28-322.05 were to go in to effect, he "would cease to exist" as far as his personal, family, and business lives are concerned.  (Tr. 534:21-25.)

## C.   *Defendants' Witnesses*

### 1.   *Hemanshu Nigam*

The defendants' expert witness, Hemanshu Nigam, is the founder and CEO of SSP Blue, an online safety advisory firm that provides strategic business consulting services to corporations and governments on Internet safety, security, and privacy issues. (Ex. 305.) Nigam's experience in the world of Internet security and safety spans more than 20 years, through service as the Chief Security Officer for News Corporation and as an officer involved in Internet security issues at Microsoft, as well as through prosecutorial experience involving online child pornography and child predator and child trafficking cases for the United States Department of Justice and the Los Angeles County District Attorney's Office. (*See* Ex. 305, Curriculum Vitae at pp. 11-15.)

Nigam recognized that "[w]hen the Internet was being created, one of the things that people were trying to do was try to create what's happening in the real world." (Tr. 188:12-14.)  For example, an online "chat room," as defined in Neb. Rev. Stat. § 29-4001.01(3), is the equivalent of a "party," or any room with multiple people present, where every person in the room can talk to one another or engage in a more private one-on-one conversation off to the side.  (Tr. 193:20-194:3, 253:23-254:3.)

24

Nigam testified that "instant messaging" is the equivalent of a private conversation between two people, with no one else listening.  (Tr. 193:5-11, 254:14-18.)  Finally, Nigam stated that "social networking web sites" reflect common real-world situations like book clubs or other social settings, where individuals gather with other individuals who are also members of the club or group and share things with each other.  (Tr. 253:2-19.)

Nigam disagreed that the statutory terms in Neb. Rev. Stat. § 29-4001.01 could include a vast amount of the Internet.  He testified that a "chat room" would not include cellular telephone service because the two operate on different "platforms" (Tr. 199:18-24), nor would it include blog postings.  (Tr. 200:8-201:23.)  E-mail also would fall outside the definition of chat room because each medium uses a "different language."  (Tr. 202:3-7.)  Nigam stated that SMS texting would not be included in the definition of "instant messaging" for several reasons—first, SMS texting and instant messaging operate using different protocols (Tr. 189:6-18), and second, the mechanics of delivery of a SMS text message and an instant message differ.  A text message "goes to a company that then delivers it to you," while an instant message is sent directly to a recipient, bypassing the service-provider in the middle.  (Tr. 191:16-192:12.)  Therefore, Neb. Rev. Stat. § 28-322.05 would not prohibit texting.  (Tr. 255:15-23.)

Nigam does not believe a "collection of web sites," as used in the definition of "social networking web site" in Neb. Rev. Stat. § 29-4001.01, means properties a company such as *Google* owns; rather, it means "one property and all the different pages that are associated to the site because those are the web pages that are part of that web site."  (Tr. 206:17-207:5.)  Nigam believes that one does not "use[]" a social networking web site, instant messaging, or chat room service within the meaning of Neb. Rev. Stat. § 28-322.05(1) unless they are engaging in what "all of them require which is communication."  (Tr. 219:1-6.)

25

Regarding the language in section 28-322.05(1) that bars knowing and intentional use of a social networking web site, instant messaging, or chat room service that allows a "person who is less than eighteen years of age to access or use" it, Nigam stated that as a practical matter, one would need to look daily at the terms of use of those sites and services in order to comply with this statute, but from "a good faith perspective, [he] would be comfortable if somebody checked it the first time they actually registered and start[ed] using it."  (Tr. 258:1-260:4.)

### 2.    *Scott Haugaard*

Scott Haugaard is a 14-year investigator with the Nebraska State Patrol who has worked the last four years with the FBI's Cyber Crimes Task Force.  (Tr. 554:12-20.) Haugaard has experience investigating online enticement, child pornography and exploitation, and other crimes against children involving the Internet.  (Tr. 555:7-23.)

When assigned to online child enticement investigations, Haugaard would present himself on the Internet as a child and wait for individuals to introduce themselves.  (Tr. 569:15-23.)  The introduction would frequently occur via instant message through a service like *Yahoo Instant Messenger*.  Haugaard also participated in chat rooms. (Tr. 570:3, 571:8, 572:15.)  From there, the individuals would begin "grooming" their victims through communication intended to "kindle a friendship" and "build up self-esteem" in their victim.  (Tr. 572:19-574:3.)  Then, the individual would begin discussing sex and eventually propose a meeting "for the purposes of real physical sex."  (Tr. 573:6-8.)

Haugaard testified that having a registered sex offender's e-mail addresses and Internet identifiers, as required by Neb. Rev. Stat. § 29-4006(1)(k) and (s), would allow law enforcement to remotely monitor those addresses and identifiers and link them to a specific person in the event "an investigation started."  (Tr. 576:13-21.) Law enforcement officers currently use several programs and software packages that allow officers to "plug in, say, an e-mail address or a[n] instant messenger moniker

26

. . . and identify an individual." (Tr. 577:20-24.)  Without this information, law enforcement officers previously could only accomplish this by searching an individual's computer. (Tr. 577:25-578:1.)  Haugaard testified that even when law enforcement personnel know a sex offender's e-mail addresses or other online identifiers, any monitoring by law enforcement would not include the content of a registrant's messages or Internet activity, and such identifiers are not made public. (Tr. 576:15, 577:6-8, 578:2-4.)

## III.  CONCLUSIONS OF LAW

### A.    *Facial and As-Applied Challenges*

"A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745, 107 S. Ct. 2095, 95 L. Ed. 2d 697 (1987); *see also Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449–50, 128 S. Ct. 1184, 170 L. Ed. 2d 151 (2008) (reaffirming the *Salerno* test outside the context of certain First Amendment challenges).  This is because facial challenges "run contrary to the fundamental principle of judicial restraint that courts should neither anticipate a question of constitutional law in advance of the necessity of deciding it nor formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied." *Wash. State Grange*, 552 U.S. at 450, 128 S. Ct. 1184 (internal quotation marks omitted).

*TCF Nat'l Bank v. Bernanke*, 643 F.3d 1158, 1163 (8th Cir. 2011).  *See also United States v. Stephens*, 594 F.3d 1033, 1037 (8th Cir. 2010) (discussing facial and as-applied challenges).  In the First Amendment context, and as further explained below, facial challenges may be applied when there "is a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court." *Roach v. Stouffer*, 560 F.3d 860, 870 n.5 (8th Cir. 2009) (internal quotation marks & citations omitted).

27

**B.     *First Amendment Challenges to Sections 28-322.05 & 29-4006(1)(k) and (s)***

Plaintiffs attack section 28-322.05 because that statute's partial ban on Internet use by certain offenders, upon pain of criminal conviction, violates the plaintiffs' right to free speech under the United States and Nebraska Constitutions.  Plaintiffs also challenge sections 29-4006(1)(k) and (s) because the requirement that registrants must disclose information about Internet use violates their right to freedom of speech guaranteed by the First Amendment and the Nebraska equivalent.  "The parameters of the constitutional right to freedom of speech are the same under both the federal and the state Constitutions."  *State v. Hookstra*, 638 N.W.2d 829, 833 (Neb. 2002).

The Supreme Court has made clear that First Amendment protections for speech fully extend to Internet communications, as well as to anonymous speech.  *See Reno v. ACLU*, 521 U.S. 844, 870 (1997) (explaining that the Internet allows "any person with a phone line [to] become a town crier with a voice that resonates farther than it could from any soapbox" and that "our cases provide no basis for qualifying the level of First Amendment scrutiny that should be applied to this medium"); *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 342 (1995) (stating that "an author's decision to remain anonymous . . . is an aspect of the freedom of speech protected by the First Amendment").

States may regulate content-neutral speech[7] (a) if the regulation is narrowly tailored to serve a significant governmental interest *and* (b) if the regulation leaves open ample alternative channels for communication of information.  *See Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).  It is immaterial that the government's interest might be adequately served by some less-restrictive alternative.  *Id.* at 798.

---

[7]I previously assumed that Neb. Rev. Stat. §§ 29-4006(1)(k) and (s) and 28-322.05 should be deemed content-neutral for purposes of First Amendment analysis.  (Filing 354 at CM/ECF p. 36 n.35.)  The parties have not persuaded me otherwise, as the statutes at issue apply "regardless of content or viewpoint."  *Phelps-Roper v. Troutman*, 662 F.3d 485, 489 (8th Cir. 2011).

28

*See also Turner Broadcasting Sys., Inc. v. F.C.C.*, 512 U.S. 622, 662 (1994) ("To satisfy this standard, a regulation need not be the least speech-restrictive means of advancing the Government's interests.").

"A statute is narrowly tailored if it targets and eliminates no more than the exact source of the 'evil' it seeks to remedy.  A complete ban can be narrowly tailored, but only if each activity within the proscription's scope is an appropriately targeted evil." *Frisby v. Schultz*, 487 U.S. 474, 485 (1988) (citation omitted).  This standard "does not mean that a . . . regulation may burden substantially more speech than is necessary to further the government's legitimate interests.  Government may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." *Ward*, 491 U.S. at 799.  "[H]owever, the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative." *Ward*, 491 U.S. at 800.

> That the Government's asserted interests are important in the abstract does not mean, however, that the [regulation on speech] will in fact advance those interests.  When the Government defends a regulation on speech as a means to redress past harms or prevent anticipated harms, it must do more than simply posit the existence of the disease sought to be cured.  It must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way.

*Turner*, 512 U.S. at 664 (internal quotation marks & citation omitted).

If the challenged statute fails to meet *either* prong of the test—narrow tailoring or failure to leave open ample alternative channels—the statute fails. *See*, *e.g.*, *Olmer v. City of Lincoln*, 23 F. Supp. 2d 1091, 1103 (D. Neb. 1998) ("The ordinance [intended to protect children from graphic visual depictions of aborted fetuses] is not narrowly tailored to serve a constitutionally important government interest.

Therefore, it is unnecessary to determine whether the ordinance leaves open ample alternative channels of communication."), *aff'd*, 192 F.3d 1176 (8th Cir. 1999) (finding that because ordinance was not narrowly tailored, ordinance was facially unconstitutional; not considering alternative channels of communication).

At the outset, it should also be noted that the plaintiffs assert, as part of their First Amendment challenge, that the statues are overbroad. In the First Amendment context, overbreadth is a remedial question and not a separate reason for finding that a statute violates the First Amendment.[8] *See*, *e.g.*, Scott A. Keller & Misha Tseytlin, *Applying Constitutional Decision Rules Versus Invalidating Statutes in Toto*, 98 Va. L. Rev. 301, 348 (2012) ("The overbreadth invalidation rule *only applies to the remedial question* of whether to invalidate a statute in toto—*not to the initial inquiry into whether a constitutional violation exists under the relevant decision rule*.") (emphasis added).

With these principles in mind, I next turn to an analysis of the challenges to sections 28-322.05 and 29-4006(1)(k) and (s). For the sake of clarity, I analyze each of these two sections separately regarding the plaintiffs' First Amendment challenges.

### 1.   *Section 28-322.05*

Certain sex offenders who committed crimes against minors are banned from using social networking web sites, instant messaging, and chat room services under section 28-322.05 upon pain of a jail or prison sentence. The age of the triggering conviction does not matter. The fact that the offender has a clear record since the conviction does not matter. The fact that the offender is not under court supervision does not matter. The fact that the offender legitimately needs access to the banned

---

[8]However, the closely related but separate question of whether an expansively worded statute chills the plaintiffs' speech because it lacks clarity *is* a substantive reason for finding that a statute violates the First Amendment.

sites to make his or her living does not matter.  The fact that the offender legitimately needs access to the banned sites to obtain news that probably cannot be obtained in another way does not matter.  The fact that the offender legitimately needs access to the banned sites to check on the health and well-being of his children while they are in a distant hospital does not matter.  The fact that the offender did not use any of the banned sites to commit his or her crime does not matter.

In relevant part, the statute reads as follows:

Any person required to register under the Sex Offender Registration Act who is required to register because of a conviction for one or more of the following offenses, including any substantially equivalent offense committed in another state, territory, commonwealth, or other jurisdiction of the United States, and who knowingly and intentionally uses a social networking web site, instant messaging, or chat room service that allows a person who is less than eighteen years of age to access or use its social networking web site, instant messaging, or chat room service, commits the offense of unlawful use of the Internet by a prohibited sex offender: [listing offenses].

Neb. Rev. Stat. § 28-322.05(1).

The plaintiffs admit that the State has a significant, even compelling, government interest in protecting minors online from sex offenses.  Indeed, there is no doubt that minors access certain sites quite heavily.  *See*, *e.g.*, *J.S. ex rel. Snyder v. Blue Mountain Sch. Dist.*, 650 F.3d 915, 951 (3rd Cir. 2011) (en banc) (Judge Fisher, with Scirica, Rendell, Barry, Jordan, and Vanaskie dissenting) ("Twenty-three percent of teenagers between the ages of 12 and 17 who own cell phones use them to access social networking sites like MySpace and Facebook.") (citation omitted).  Nonetheless, the plaintiffs forcibly argue that section 28-322.05 suppresses too much speech—that is, the statutes limit use of the "most popularly used mediums used in everyday life for all types of communication."  (Filing 496, Pls.' Trial Br. at CM/ECF p. 13.)

31

After very careful deliberation, I decide that Neb. Rev. Stat. § 28-322.05 is not narrowly tailored.  I also decide that the statute does not leave open ample alternative channels for communication of information.  Recognizing that either decision is enough to invalidate the statute, I next explain my reasoning.

### a.      Narrow Tailoring

Whatever else the words of Neb. Rev. Stat. § 28-322.05 might mean, it is undisputed that those words ban the offenders described in the statute from using ubiquitous utilities such as *MySpace*, *Facebook*, *Skype*, *Twitter*, *Windows Live Messenger*, and *Google+*[9] together with a large number of other utilities.  In order to understand the significance of the ban, it is important to understand the size and overarching presence of "social networking web sites" and "instant messaging" and "chat room" services on the Internet.  Consider the following:

* "By the end of 2008 and the start of 2009, social networking became even more popular than e-mail."  Geelan Fahimy, *Liable for Your Lies: Misrepresentation Law as a Mechanism for Regulating Behavior on Social Networking Sites*, 39 Pepp. L. Rev. 367, 384 (2012).

* Social networking sites are now used by all demographic groups—one study in 2010 showed that "forty-seven percent of Internet users aged

---

[9]I use these six utilities merely as examples because they are widely known and because it is essentially undisputed that each one would be categorized as a "social networking web site" or "instant messaging" service or "chat room" service within the meaning of the statute.  Indeed, all of them appear to have the attributes of all three of these categories.  For a more expansive list of sites that may potentially be banned by the statute, see Filing 354, Attachment A (Mem. & Order on Summ. J. Motions).  To avoid increasing the length of this opinion, I incorporate that information (Filing 354, Attachment A) herein.

fifty to sixty-four years old and twenty-six percent of those over sixty-five use social networking sites."   *Id.* at 385.

*         *MySpace* has over 100 million users, and 50% of those are outside the United States.   *Id.* at 386.

*         In May of 2012, *Facebook* had 901 million monthly active users, 3.2 billion "likes and comments" per day, 300 million photos uploaded per day, and 125 billion "friendships."   Facebook, Inc., *Amendment 6 to Form S-1,* filed with Securities Exchange Commission (May 9, 2012) (p. 5 of 227) (graphic on table-of-contents page).[10]

*         *Skype*, which is now owned by Microsoft, had 170 million users and over 207 billion minutes of voice and video conversations in 2010.   Microsoft News Center, *Microsoft to Acquire Skype* (May 10, 2011).[11]   In late 2012 or 2013, *Skype* will become part of Microsoft "Office." Microsoft News Center, *Microsoft unveils the new Office* (July 16, 2012).[12]   Microsoft "Office," a suite of applications including *Word*, *Excel*, and *PowerPoint*, has over a billion users worldwide.   Ionut Arqhire, *Microsoft's Office Has over One Billion Users*, Softpedia (July 10, 2012).[13]

---

[10] http://www.sec.gov/Archives/edgar/data/1326801/000119312512222368/d287954ds1a.htm.

[11] http://www.microsoft.com/en-us/news/press/2011/may11/05-10corpnewspr.aspx.

[12] http://www.microsoft.com/en-us/news/Press/2012/Jul12/07-16OfficePR.aspx.

[13] http://news.softpedia.com/news/Microsoft-s-Office-Has-Over-One-Billion-Users-280426.shtml.

\*      As of February 2012, 15% of online adults use *Twitter*, and 8% do so on a typical day.  Pew Research Center, *Twitter Use 2012* (May 31, 2012).[14]

\*      As of February 2010, *Windows Live Messenger* was used by 300 million people in 76 countries, and that use produced 1.5 billion conversations and 9 billion messages per day.  Jeff Kunins, *Windows Live Messenger* (Feb. 9, 2010).[15]

\*      In just over a year since its release, 400 million people have installed *Google+* and 100 million of those use the utility monthly.  Vic Gundotra, *#googleplusupdate* (Sept. 17, 2012).[16]

\*      Thirty-six percent of American social networking web site users believe that the sites are "very important" or "somewhat important" to them in keeping up with political news.  Pew Research Center, *Politics on Social Networking Sites* (Sept. 4, 2012).[17]  For example, the 2012 "Republican convention alone drew 5 million tweets."  Beth Fouhy, *For conventions, TV viewing down, social media up*, Associated Press (Sept. 4, 2012).[18]

\*      Of the 500 fastest growing companies in America, 74% of those companies use *Facebook*.  Nora Ganim Barnes, Ph.D. & Ava M. Lescault, MBA, *The 2012 Inc. 500 Social Media Update: Blogging*

---

[14] http://pewinternet.org/Reports/2012/Twitter-Use-2012.aspx.

[15] http://windowsteamblog.com/windows_live/b/windowslive/archive/2010/02/09/windows-live-messenger-a-short-history.aspx.

[16] https://plus.google.com/u/0/+VicGundotra/posts/2YWhK1K3FA5.

[17] http://pewinternet.org/Reports/2012/Politics-on-SNS.aspx.

[18] http://www.boston.com/news/politics/2012/2012/09/04/for-conventions-viewing-down-social-media/85HHjj9XAbn2JTumPQBVaJ/story.html.

*Declines as Newer Tools Rule*, UMass Dartmouth.[19]  Of Fortune 500
companies, 62% have active *Twitter* accounts and 58% have a *Facebook*
page.  Shelly Kramer, *How Fortune 500 Companies Use Social Media*,
V3 Integrated Marketing (May 28, 2012).[20]

So far as the scope of the statute is concerned, this ban precludes the offenders
described in the statute from using an enormous portion of the Internet to engage in
expressive activity.  No reasonable person could deny that fact.  The ban not only
restricts the exchange of text between adults; it also restricts the exchange of oral and
video communication between adults.  Moreover, the ban potentially restricts the
targeted offenders from communicating with hundreds of millions and perhaps
billions of adults and their companies despite the fact that the communication has
nothing whatsoever to do with minors.

### (i)      Ban Not Dependent Upon Past Use of Social Utilities

Critically, the ban is not contingent upon the past use of the banned utilities to
prey upon minors.  To be specific, the ban does not require a showing that the
offender used social networking web sites, instant messaging, or chat room services
to prey upon children.[21]  Nor does it require a showing that the offender poses a

---

[19]http://www.umassd.edu/cmr/socialmedia/2012inc500socialmediaupdate/.

[20]http://www.v3im.com/2012/05/how-fortune-500-companies-use-social-me
dia/#axzz28AfWBcwg.

[21]Does 4, 6, 13, 18, 19, 27, and 35 committed crimes that make them subject to
the statute, but it is stipulated that they did not use a computer or electronic
communication device to do so.  (Filing 492, Pretrial Conf. Order at CM/ECF p. 2.)
Thus, it is apparent that they did not use a social networking web site, instant
messaging, or chat room service to commit their crimes.  Does 2, 3, 12, 17, and 24 are
subject to the statute, and they used a computer or electronic communication device
to commit their crimes.  (*Id.*)  It is not clear, however, whether these Does used a
social networking web site, instant messaging, or chat room service to commit their

present threat to use those utilities to get at children. On the contrary, the ban is triggered by the commission of a crime against children (often committed in the far-distant past) that may be entirely unrelated to whether the offender used (or threatens to use) a social networking web site, instant messaging, or chat room service to victimize minors.

In other words, the statute is not narrowly tailored to target those offenders who pose a factually based risk to children through the use or threatened use of the banned sites or services. The risk posited by the statute is far too speculative when judged against the First Amendment. The broad scope of the ban is a fatal deficiency. *See*, *e.g.*, *Doe v. Jindal*, 853 F. Supp. 2d 596, 607 (M.D. La. 2012) (holding Louisiana's statute precluding registered sex offenders from using or accessing social networking sites, chat rooms, and peer-to-peer networks unconstitutional; "The sweeping restrictions on the use of the internet for purposes completely unrelated to the activities sought to be banned by the Act impose severe and unwarranted restraints on constitutionally protected speech. More focused restrictions that are narrowly tailored to address the specific conduct sought to be proscribed should be pursued."); *Note*, Jasmine S. Wynton, *My Space, Your Space, But Not Their Space: The Constitutionality of Banning Sex Offenders from Social Networking Sites*, 60 Duke L.J. 1859, 1888-1889 (2011) ("There are less restrictive ways of serving states' compelling interest than such blanket prohibitions. . . . [S]tates can narrow the application of social-networking-site bans to only those sex offenders who used the Internet or social networking sites in the commission of their underlying offenses. Indeed, some states have taken this more narrowly tailored approach.").

I am aware of *Doe v. Prosecutor, Marion Cnty.*, No. 1:12-cv-00062, 2012 WL 2376141 (S.D. Ind. 2012) (holding that Indiana's ban on accessing social networking sites, instant messaging services, and chat room services by certain sex offenders did not violate First Amendment). With respect, and for numerous reasons, I am not

_____

crimes.

36

persuaded by that decision.  I will highlight only one point to illustrate my view that the Indiana judge's reasoning throughout the opinion is weak.

Central to the judge's ruling was a curious statement.  The judge wrote that "Mr. Doe's argument is important for what it does *not* say.  Tellingly, Mr. Doe never furnishes the Court with workable measures that achieve the same goal . . . ." *Id.* at *7 (emphasis in original).  Setting to one side the dubious proposition that a plaintiff making a First Amendment challenge is obligated to inform the state how to write a statute in conformity with the Constitution, there is a very easy answer to the judge's rhetorical flourish.  That is, the constitutional response to the judge's concern is to narrow the statute to those who have preyed upon children using the banned sites. *Plainly put:*  Concentrate on demonstrated risk rather than speculating and burdening more speech than is necessary—use a scalpel rather than a blunderbuss.  For reasons that are unclear, the judge wholly ignores this seemingly obvious point.

In summary, the statute "burden[s] substantially more speech than is necessary to further the government's legitimate interests.  Government may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." *Ward*, 491 U.S. at 799.  The statute therefore violates the First Amendment.

### (ii)    *Ban Expansive And Vague*

But that does not end the First Amendment concern.  There is another sense in which the statute is not narrowly tailored and therefore violates the First Amendment's guarantee of free speech.  The statute is so expansive and so vague that it chills offenders and their associates, including individuals and entities not before the court,  from using those portions of the Internet that the defendants claim are open to them.  Those twin deficiencies violate the First Amendment (as well as the Due Process Clause).

37

Expansively written laws designed to protect children are *not* exempt from the constitutional requirement of clarity under both the First Amendment and the Due Process Clause:

> Due process requires that laws give people of ordinary intelligence fair notice of what is prohibited. *Grayned v. City of Rockford*, 408 U.S. 104, 108, 92 S. Ct. 2294, 33 L. Ed. 2d 222 (1972). The lack of such notice in a law that regulates expression "raises special First Amendment concerns because of its obvious chilling effect on free speech." *Reno v. American Civil Liberties Union*, 521 U.S. 844, 871–872, 117 S. Ct. 2329, 138 L. Ed. 2d 874 (1997). Vague laws force potential speakers to "'steer far wider of the unlawful zone'. . . than if the boundaries of the forbidden areas were clearly marked." *Baggett v. Bullitt*, 377 U.S. 360, 372, 84 S. Ct. 1316, 12 L. Ed. 2d 377 (1964) (quoting *Speiser v. Randall*, 357 U.S. 513, 526, 78 S. Ct. 1332, 2 L. Ed. 2d 1460 (1958)). While "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity," *Ward v. Rock Against Racism*, 491 U.S. 781, 794, 109 S. Ct. 2746, 105 L. Ed. 2d 661 (1989), "government may regulate in the area" of First Amendment freedoms "only with narrow specificity," *NAACP v. Button*, 371 U.S. 415, 433, 83 S. Ct. 328, 9 L. Ed. 2d 405 (1963); see also *Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499, 102 S. Ct. 1186, 71 L. Ed. 2d 362 (1982). *These principles apply to laws that regulate expression for the purpose of protecting children.* See *Interstate Circuit, Inc. v. Dallas*, 390 U.S. 676, 689, 88 S. Ct. 1298, 20 L. Ed. 2d 225 (1968).

*Brown v. Entm't Merch. Ass'n*, 131 S. Ct. 2729, 2743 (2011) (holding ban on sale of violent video games to minors violated the First Amendment) (Justice Alito, with Chief Justice Roberts, concurring) (emphasis added).

Several examples are illustrative of the expansive nature of the statute and its lack of clarity. I will start with a fairly simple example of the problem using "text messages" and "instant messaging" as the focal point. I will then proceed to use the defendants' proposed narrowing constructions to further highlight the lack of clarity.

The statute states that an offender covered by the statute may not "use" an "instant messaging" service. "Instant messaging" is then defined as "a direct, dedicated, and private communication service, accessed with a computer or electronic communication device, that enables a user of the service to send and receive virtually instantaneous text transmissions or computer file attachments to other selected users of the service through the Internet or a computer communications network." Neb. Rev. Stat. § 29-4001.01(11). The defendants claim that "text messages"—as opposed to "instant messages"—are not covered because those messages are not sent and received "virtually instantaneously." If "text messages" are covered, that would pose an insurmountable burden for the defendants to overcome because there are literally billions of text messages sent every day in the United States.[22]

Put aside, for the moment, the ambiguity of the words "virtually instantaneous." Assume, for the sake of argument, that I conclude that "text messages" are not covered by the statute because the exchange between the sender and the recipient is not "virtually instantaneous." Nevertheless, there remains a big problem.

Although the defendants are apparently unaware of the technology, "text messages" can be sent and received by instant messaging services such as *Google Talk*, *Windows Live Messenger*, and *Yahoo Messenger*. *See* Brandon De Hoyos, *8 Free Text Messaging Services, Apps*[23]; David Pogue, *The Disruptive Power of iMessage*, N.Y. Times (Mar. 22, 2012) ("It started with iMessages, an iPhone/iPad app that lets you send text messages between Apple hand-held gadgets without cost. Instead of using the cellphone network (and paying 20 cents each or whatever), texts

---

[22]In 2011, one commentator observed that 2.5 billion text messages were sent per day in the United States and the commentator further noted that *Apple, Google,*and *Microsoft* were beginning to provide free text messaging services. *Dead Zone* (May 26, 2011), http://www.deadzones.com/search?q=how+many+text+messages+are+sent+a+day.

[23]http://im.about.com/od/advancedimfeatures/tp/free-text-messages.htm.

you send using this little app get sent across the Internet, costing you pretty much nothing.").[24]  Indeed, there is an economic incentive to use an instant messaging service to send text messages—they are "free."  Does an offender who knowingly and intentionally "uses" an "instant messaging" service *only* for the purpose of sending or receiving "text messages" commit a crime?  The defendants do not know, and neither do I.[25]

### (iii)    Proposed Narrowing Constructions Further Illustrate Vagueness

The defendants have proposed a number of limiting constructions in apparent recognition that the statute is both overbroad and vague.  They are:

1.    "Collection of web sites," as used in the definition of "social networking web site," Neb. Rev. Stat. § 29-4001.01(13), includes only those URLs (Uniform Resource Locators) that share common domain names, but contain different directories or subdirectories.  For example, www.espn.com and www.davidpost.com would not be part of the same "collection of web sites," but www.davidpost.com/about and www.davidpost.com/publications would be because they "share the same top-, second-, and third-level domain names and differ only with respect to the directories included to the right of the top-level domain name." (Filing 522 at CM/ECF p. 24.)

2.    Whether a social networking web site, instant messaging, or chat room service "allows" a minor to access or use the site or service in section 28-

---

[24]http://pogue.blogs.nytimes.com/2012/03/22/the-disruptive-power-of-imessage

[25]Nor do the defendants propose a limiting construction that addresses this issue.

322.05(1) includes "only those that expressly say so in their terms of use." (Filing 522 at CM/ECF p. 25.)  The State maintains that each time a registered sex offender attempts to use a site or service, he or she must view the site's terms and conditions of use.  If the site expressly limits use of its services to those 18 or older, section 28-322.05 would not prohibit use of the site; if the terms of use allow those 13 or older to use the site, section 28-322.05 would prohibit use of the site; and if the terms of use are silent as to the age of its users, "the registered sex offender could not be guilty of 'knowingly and intentionally' using such a site, the mens rea required under Neb. Rev. Stat. § 28-322.05." (Filing 522 at CM/ECF p. 26.)

3.   A registered sex offender does not "use" a prohibited site or service under section 28-322.05 unless the offender "communicates with another person on the site or service."  Therefore, "[m]erely accessing a site to read the terms of use, or to read content on a page, would not constitute 'use' prohibited under the language of the statute." (Filing 522 at CM/ECF p. 28.)

4.   "Virtually instantaneous" for purposes of the definitions of "chat room" and "instant messaging" in Neb. Rev. Stat. § 29-4001.01(3) and (10) means "real time." (Filing 522 at CM/ECF p. 29.)  Therefore, e-mail would not be encompassed within those definitions because "the provider stays in the middle of that transaction" and "holds the communication . . . until somebody on the other side decides to go get it." (Tr. 192:13-16.)

As an initial matter, I reject these proposed limiting constructions because the statute is not "readily susceptible" to the proposed interpretations.  To be specific, the constructions are not "reasonable" or "readily apparent" from the language and history of the statute.

A limiting construction cannot be supplied unless an ordinance is "readily susceptible" to such an interpretation, *see State of Va. v. Am. Booksellers Ass'n*, 484 U.S. 383, 397, 108 S. Ct. 636, 98 L. Ed. 2d 782 (1988), because federal courts "lack jurisdiction authoritatively to construe state legislation." *Gooding v. Wilson*, 405 U.S. 518, 520, 92 S. Ct. 1103, 31 L. Ed. 2d 408 (1972), *quoting United States v. Thirty-Seven Photographs*, 402 U.S. 363, 369, 91 S. Ct. 1400, 28 L. Ed. 2d 822 (1971). Limiting constructions of state and local legislation are more appropriately done by a state court or an enforcement agency. *Ward v. Rock Against Racism*, 491 U.S. 781, 795-96, 109 S. Ct. 2746, 105 L. Ed. 2d 661 (1989).

*Ways v. City of Lincoln*, 274 F.3d 514, 519 (8th Cir. 2001). *See also United States v. Stevens*, 130 S. Ct. 1577, 1592 (2010) (in applying limiting construction, court will not rewrite law to conform it to constitutional requirements because it would "constitute a serious invasion of the legislative domain" and "sharply diminish" the legislative body's "incentive to draft a narrowly tailored law in the first place") (internal quotation marks & citations omitted); *United Food & Commercial Workers Int'l Union v. IBP, Inc.*, 857 F.2d 422, 431 (8th Cir. 1988) (although federal courts are "generally without authority to construe or narrow state statutes," courts may adopt party's limiting construction if that construction is "reasonable and readily apparent" from language and legislative history of statute).

Nonetheless, these proposed limiting constructions are good examples of the expansive and vague nature of the statute. Without intending to cover each of the problems with these constructions, I will examine each construction in turn to illustrate my concerns.

The first proposed construction relates to the definition of "social networking web site" and "collection of web sites" and, frankly, it is among the most forceful examples of the vagueness of the statute. It proposes to define a "collection of web sites" to mean sites that share common domain names, but contain different directories or subdirectories—that is, sites that "share the same top-, second-, and third-level

domain names and differ only with respect to the directories included to the *right* of the top-level domain name." (Emphasis added.) While I cannot fathom how anyone could have derived this limiting construction from the words of the statute or its history, and while it is apparent that the construction derives from the exigencies of this litigation rather than the words and history of the statute, the construction itself perfectly shows the lack of clarity.

What if one of the "directories" in a "collection of web sites" were to the *left* of the "top-level domain name" as with some *Google* products?[26] Even more confusingly, what if you could access a seemingly innocuous "homepage" such as *iGoogle*, with a "directory" to the *right* of the "top-level domain name," but that access would seamlessly take you to a site with a "directory" to the *left* of the "top-level domain name" such as *Google+, Google's* "*Facebook*" equivalent?[27] These are perfectly genuine questions for which the proposed construction, and the defendants, provide no answer.

The second proposed construction is a good example of this confusion as well. That construction purports to limit the word "allows" to the "terms of use" of the respective sites. It therefore delegates to a private party the meaning of the word "allows." This construction also ignores the fact that web sites may violate their own terms of use and knowingly "allow" children to use the web site despite the terms of use. *See*, *e.g.*, *Xanga.com to Pay $1 Million for Violating Children's Online Privacy*

---

[26]For example, compare (1) *Google's* "*Facebook*" equivalent known as *Google+*, https://plus.google.com/, with (2) *Google* (the search engine), http://www.google.com/.

[27]Using *iGoogle*, http://www.google.com/ig, *Google*'s "home page," one can click on the "+You" symbol and that act takes you directly to *Google+*, https://plus.google.com/, *Google*'s "*Facebook*" equivalent, without having to log in to *Google+*. Is that scenario a "collection of web sites"? (As opposed to *Internet Explorer*, access the links in this footnote through *Google Chrome*, *Mozilla Firefox*, or another browser.)

*Protection Rule* (Federal Trade Commission Press Release, Sept. 7, 2006).[28]  Keying on the vendor's terms, rather than what takes place in practice, this proposed construction is flatly inconsistent with the plain meaning of the word "allows."  Still further, the second proposed construction imposes upon the offender the obligation to read and understand[29] the vendor's terms-of-use policy *each* time the offender uses the site.[30]  Importantly, this construction also fails to acknowledge that the "terms of use" may be worded in such a way as to permit change without notice.  In effect, defense counsel propose that the word "allows" in the statute means whatever *Google* or some other vendor says it means from one minute to the next.

The third proposed construction also proves the lack of clarity.  It suggests that "use" requires that the offender "communicate[] with another person on the site or service."  What if the offender registered with *Google+* and publicly posted a profile that invited business people to contact the offender at his business telephone number or business address, but the offender never had a "chat" on *Google+* or sent a text or instant message through *Google+* or responded to such a message in *Google+*?  Has

---

[28]http://www.ftc.gov/opa/2006/09/xanga.shtm.  In that case, the Federal Trade Commission alleged that *Xanga*, a social networking site with 25 million registered accounts, knowingly allowed children under age 13 to participate despite the terms of use.  *Xanga* agreed to the entry of a consent degree and payment of a large penalty.

[29]If a terms of "use" policy stated that 16- and 17-year-old teenagers, *with the consent of their parents*, could use the site, but all other children are prohibited from doing so, are 16- and 17-year-olds "allowed" to use the site?

[30]As a former prosecutor, Mr. Nigam was "comfortable" in declining prosecution of an offender who violated the law after the terms of use changed if the offender checked the web site before the change, but not each time the offender used the site.  (Tr. 258:1-260:4.)  That attitude may not, of course, be shared by Nebraska prosecutors, and it is a prime example of the vice of this vagueness.  Nigam's implicit suggestion that a vague statute can be saved by depending upon prosecutors to sort out the meaning of a statute was, to say the least, unsettling.  Among other things, it evidenced a complete misunderstanding of the law.

the offender "used" *Google*+?   Again, the defendants have no answer to this basic question, and neither do I.

Without intending to be unkind, the fourth suggested construction is laughable. It states that "virtually instantaneous"—for purposes of "instant messaging" services or "chat rooms"—means "real time."   What, in the world, does "real time" mean? Particularly when it comes to "text messages" sent through "instant messaging" services, the substitution of the words "real time"[31] for "virtually instantaneous" is of no help whatever in clarifying the glaring ambiguity in the statute.   The proposed construction is very much like a dog chasing its tail—the dog and the tail simply turn in a humorous circle.

While there are numerous other examples of the incoherence of the statute,[32] the foregoing examples make the point starkly.   The statute is expansive and unclear, even after good defense lawyers tried to make sense out of it.   In short, it is not "narrowly tailored."

---

[31]In the computer world, "real time" may simply mean "predictable."   For example, "'[r]eal-time', as used in the context of the Sun Java Real-Time System product, means predictable.   Real-time does not, in this context, have the sort of 'in the moment' meaning that you hear in, for example, gaming circles."   Sun Java Real-Time System–FAQ, General, *What does real-time Java really mean?*, http://www.oracle.com/technetwork/java/javase/tech/faq-jsp-139205.html#1.

[32]First among them is the meaning of "access or use."   The statute bans use of a site that "allows a person who is less than eighteen years of age *to access or use* its social networking web site, instant messaging, or chat room service . . . ."   (Emphasis added.)   The former prosecutor who was called as a defense expert admitted that "[t]o me they are the same things but whoever wrote this must have thought there was some difference that they were trying to figure out."   (Tr. 262.)   But he could not "predict why it's written as 'access or use.'"   (Tr. 261.)

### b.    *Ample Alternative Channels*

Although the foregoing finding on "narrow tailoring" is enough to invalidate the statute, the plaintiffs also assert that the challenged statutes do not leave open comparable alternative channels of communication.  "By completely foreclosing the popular and ubiquitous mediums of social networking websites, chat rooms, and instant message systems, there are insufficient remaining avenues of communication for speech on the Internet and in society."  (Filing 496 at CM/ECF pp. 14-15.)  The defendants respond that the use of the Internet is not entirely foreclosed.  Frankly, this is a little like banning the use of the telephone and then arguing that First Amendment values are preserved because the user can (perhaps) resort to a walkie-talkie.

As a general matter, "one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place."  *Schneider v. New Jersey*, 308 U.S. 147, 163 (1939).  More specifically, the Supreme Court has said that even when the government has a compelling interest in restricting one channel of speech, there must be "*ample* alternative channels" left open.  *Ward*, 491 U.S. at 791 (emphasis added).  The Supreme Court uses the word "ample" not as an afterthought, but as a real safeguard.  *See, e.g., Linmark Assoc., Inc. v. Willingboro Tp.*, 431 U.S. 85, 93 (1977) (township ordinance prohibiting posting of real estate "For Sale" and "Sold" signs for purpose of stemming what township perceived as flight of white homeowners from racially integrated community violated First Amendment because alternative methods of communication, which involved more cost and less autonomy than signs and were less likely to reach persons not deliberately seeking sales information, were insufficient).

Two examples illustrate why the statute does not leave open "ample" alternative channels.  One example is taken from the headlines of a recent tumultuous and fast-moving international event.  The other is taken from an event that has importance only to those few who are participants, but to those folks, the incident has great significance.

46

First, assume for a moment that an offender subject to the ban wanted "up-to-the-minute" information on the demonstrations that took place during the "Arab Spring." Perhaps the offender's family came from the Middle East. Perhaps the offender had family still living in that region. Perhaps the offender's relative was caught up in the turmoil. "*Twitter* and *Facebook*" played "a pivotal role in broadcasting information from inside the demonstrations in Cairo's Tahrir Square and elsewhere . . . ." Jillian C. York, *The Revolutionary Force of Facebook and Twitter*, Neiman Reports (Fall 2011).[33] Under Nebraska's ban, the offender is barred from receiving this information from *Twitter* and *Facebook*—news that might not be available from any other source—even though the hunger for that news poses no threat to children.

Second, when Doe 12's step-daughter and wife were in Wisconsin for two months because of a medical problem, he and his family members used videoconferencing to keep in touch. Put yourself in the position of an offender and imagine if your child was in a distant hospital and you could not use *Skype* to talk, see, text, and instant message with her. There is simply no alternative channel—let alone an "ample" alternative—to monitor the child's health and well-being.

In sum, if the statute were narrowed to those offenders who committed their crimes using one of the apparently banned utilities, and if the statute were purged of its breadth and vagueness, Nebraska could still allow an offender the opportunity to use utilities like *Facebook*, *Twitter*, and *Skype* upon the offender's truly voluntary consent to the installation of monitoring hardware and software. By doing so, Nebraska could cure the "narrowing" problem while leaving open sufficient alternative channels of communication. There is not the slightest reason to believe that such a targeted solution would be insufficient to address Nebraska's legitimate, rather than speculative, concerns for children.

---

[33] http://www.nieman.harvard.edu/reports/article/102681/The-Revolutionary-Force-of-Facebook-and-Twitter.aspx.

47

c.      *Overbreadth Challenge*

A regulation prohibiting "a broad range of protected expression may be facially challenged as overbroad." *Ways v. City of Lincoln*, 274 F.3d 514, 518 (8th Cir. 2001). The overbreadth doctrine "enables litigants 'to challenge a statute not because their *own* rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause *others not before the court* to refrain from constitutionally protected speech or expression.'" *Hill v. Colorado*, 530 U.S. 703, 731-32 (2000) (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973)) (emphasis added).

> Under the overbreadth doctrine, "an individual whose own speech or conduct may be prohibited is permitted to challenge a statute on its face 'because it also threatens others not before the court—those who desire to engage in legally protected expression but who may refrain from doing so.'" *Board of Airport Comm'rs v. Jews for Jesus, Inc.*, 482 U.S. 569, 574, 107 S. Ct. 2568, 96 L. Ed. 2d 500 (1987), *quoting Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 503, 105 S. Ct. 2794, 86 L. Ed. 2d 394 (1985). . . .   The overbreadth doctrine is "strong medicine" to be used "sparingly" and only when the overbreadth is not only "real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Broadrick v. Oklahoma*, 413 U.S. 601, 613, 615, 93 S. Ct. 2908, 37 L. Ed. 2d 830 (1973).

*Ways*, 274 F.3d at 518.[34]

"The first step in overbreadth analysis is to construe the challenged statute; it is impossible to determine whether a statute reaches too far without first knowing

---

[34]"The rationale for allowing an individual to assert the constitutional rights of others not before the court is that broadly written statutes may have such a deterrent effect on free expression that they should be subject to challenge even by a party whose own conduct may be unprotected." *Ways*, 274 F.3d at 518 (internal quotation marks & citation omitted).

what the statute covers." *United States v. Williams*, 553 U.S. 285, 293 (2008). Section 28-322.05(1) makes it a crime for registered sex offenders to "knowingly and intentionally use[] a social networking web site, instant messaging, or chat room service that allows a person who is less than eighteen years of age to access or use" the site or service. Section 29-4001.01 defines "social networking web site," "instant messaging," and "chat room," but "access or use" is undefined.

To put it bluntly, and as evidenced by the testimony described above, as well as the previous legal analysis, no one can truly know "what the statute covers." *Williams*, 553 U.S. at 293. The statute is simply not amendable to a reasoned construction. As Professor Post[35] explained in great detail, the terms used in section 28-322.05(1) are ambiguous, and the definitions provided in section 29-4001.01 either cover "almost everything on the Net" or "might cover virtually nothing on the Internet." (Tr. 74:17-21.) The best I can say is that the statute bars the offenders subject to the statute from having on their computers or communication devices utilities such as *MySpace*, *Facebook*, *Skype*, *Twitter*, *Windows Live Messenger*, and *Google+*.

Whatever the words of section 28-322.05 were intended to mean, it is clear that the language is properly interpreted to "criminalize[] a substantial amount of protected expressive activity," *Williams*, 553 U.S. at 297—from associating with friends, family, and business associates over the Internet (the most common method of association in the modern age) to communicating with consumers, customers, or

---

[35]Professor Post was the most thoughtful and knowledgeable of the experts. I found his discussion of the term "collection of web sites" in relation to *Google* products particularly helpful. It is worth remembering that I strongly suggested that the parties get together to hire one independent expert. I even suggested the name of an independent scholar of Internet law. (Filing 354 at CM/ECF p. 33.) The parties did not elect to do so. That was their right. However, candor requires that I state that the defense expert—a former prosecutor—struck me as biased, particularly when compared to Professor Post.

49

manufacturers regarding a commercial product or service, to posting and discussing one's political opinions on an interactive blog or news web site.  The ban reaches far beyond the individualized concerns of the plaintiffs.

In summary, Neb. Rev. Stat. § 28-322.05 is overbroad under the First Amendment.  It is therefore facially unconstitutional.

### 2.   *Section 29-4006(1)(k) and (s)*

This statute requires that *every offender* (without regard to the offense of conviction) provide the State with:

> (k)   The person's remote communication device identifiers and addresses, including, but not limited to, all *global unique identifiers*, serial numbers, *Internet protocol addresses*, telephone numbers, and account numbers specific to the device;[36]

> . . . .

> (s)   All email addresses, instant messaging identifiers, chat room identifiers, *global unique identifiers*, and other Internet communication identifiers that the person uses or plans to use, all domain names registered by the registrant, and all blogs and Internet sites maintained by the person or to which the person has uploaded any content or posted any messages or information.[37]

---

[36]The parties have stipulated in the Order on Final Pretrial Conference that the italicized language is "overbroad and unduly burdensome."  (Filing 492 at CM/ECF p. 2 ¶ 6.)  As a result, I declare this part of the statute to be unconstitutional under the First Amendment.

[37]The parties have stipulated in the Order on Final Pretrial Conference that the italicized language is "overbroad and unduly burdensome."  (Filing 492 at CM/ECF p. 2 ¶ 6.)  As a result, I declare this part of the statute to be unconstitutional under the First Amendment.

Even severing the admittedly unconstitutional portions of this statute from the remainder of the statute, I find and conclude that these portions of the statute violate the First Amendment.  Much of the case law applicable to this statute has been set out above, and I will not repeat or discuss it again.

Any suggestion that the required information is not itself "speech" disregards the fact that "[a]nonymity is a shield from the tyranny of the majority. . . . It thus exemplifies the purpose behind the Bill of Rights, and of the First Amendment in particular: to protect unpopular individuals from retaliation—and their ideas from suppression—at the hand of an intolerant society." *McIntyre*, 514 U.S. at 357 (holding that Ohio's statutory prohibition against distribution of any anonymous campaign literature violated First Amendment) (citations omitted).  With the importance of anonymity in mind, I turn to the substance.

The statute clearly chills offenders from engaging in expressive activity that is otherwise perfectly proper, and the statute is therefore insufficiently narrow.  There are several ways this occurs.

If the offender has an e-mail address, for example, and he provides his e-mail address to the State as required by Neb. Rev. Stat. § 29-4006(1)(s), he must also consent to a search of his computers and electronic communication devices in his home and elsewhere.[38]   Thus, any offender who does so much as send an e-mail

---

[38]Neb. Rev. Stat. § 29-4006(2) ("When the person provides any information *under subdivision (1)(k) or (s)* of this section, the registrant shall sign a consent form, provided by the law enforcement agency receiving this information, authorizing" a search of his computers or electronic communication devices and the installation of monitoring hardware or software) (emphasis added).  While I have declared the entirety of § 29-4006(2) facially unconstitutional on Fourth Amendment grounds for offenders who were not on probation, parole, or court-monitored supervision on or after January 1, 2010 (Filing 354 at CM/ECF p. 27), based partly on the concession of the defendants, the defendants have not fully acquiesced in that decision.  As a result, the discussion in the text remains relevant under the plaintiffs' First

message to his member of Congress is faced with the real possibility that the police will come into his home without a warrant to search his computer. In other words, the offender is forced to choose between his First Amendment rights and his Fourth Amendment rights. Many a rational offender will give up a computer and the ability to express himself on the Internet to remain secure in his home. Unless the statute is properly narrowed, the Constitution does not require offenders to give up their First Amendment rights in order to preserve their Fourth Amendment rights.

There is also another way the statute improperly chills too much speech. The questioned statute requires the offender to inform the State about "*all blogs and Internet sites maintained by the person or to which the person has uploaded any content or posted any messages or information.*" (Emphasis added.) Simply put, the statute requires offenders to tell the government if the offender has his own Internet site or blog and when and where the offender has expressed himself on that site or blog or any other blog.[39]

The Internet, and blogs in particular, allow "any person with a phone line [to] become a town crier with a voice that resonates farther than it could from any soapbox," and the precedents from the Supreme Court "provide no basis for qualifying the level of First Amendment scrutiny that should be applied to this medium." *Reno v. ACLU*, 521 U.S. at 870. Blogs frequently, and perhaps mostly, involve discussion of matters of public concern. Blogs are by their nature open to the public and pose no threat to children. That sex offenders—perhaps the most reviled group of people in our community—may "blog" threatens no child, but the government reporting requirement—that puts a stake through the heart of the First

---

Amendment challenge.

[39]One estimate puts the number of active English language blogs at 450 million. J. Haynes, *So How Many Blogs Are There, Anyway*? (Feb. 1, 2010), http://www.hattrickassociates.com/2010/02/page/2/.

Amendment's protection of anonymity—surely deters faint-hearted offenders from expressing themselves on matters of public concern.  In particular, it substantially deters offenders from criticizing the government and officials of the government, including most especially overzealous prosecutors and cops.

The same thing is true of "Internet sites maintained" by the offender.  A site publicly available on the Internet poses no threat to children—after all, every police officer in the world can see it.  But the requirement that offenders report to the police regarding the material they post to Internet sites they operate will surely deter offenders in business[40] from maintaining such sites.  In short, far too much expressive activity is unnecessarily chilled by this part of the statute.[41]

Let me be concrete.  Two examples will serve that purpose.

First, assume Doe has a business selling "widgets."  To promote his business, Doe has an Internet site entitled "Doe's Widgets."  Because the market for "widgets" is driven largely by price and prices fluctuate daily, and because Doe has a sweet deal with a manufacturer, he markets his "widgets" by claiming to beat anyone's prices. Each day, as the market fluctuates, Doe uploads a new price sheet with that day's "best" prices.  He also frequently adds testimonials from companies that have bought his "widgets."  Doe processes orders on the site and responds to customer complaints.

Under the statute, each time Doe would try to market his "widgets" on his Internet site by adding content to the site, he would be obligated to tell Nebraska when and where he made that effort.  He would be obligated to do that notwithstanding the fact that Nebraska could, if it drafted a statute that conformed with SORNA [the

---

[40]Doe 17, Doe F, Doe 3, Doe 18, Doe 2, Doe 24, and Doe 12 provided testimony about their business activity using the Internet, and that testimony has relevance to the discussion in the text.

[41]As before, it is not my proper role to narrow the statute.

federal Sex Offender Registration and Notification Act], require Doe to give Nebraska his Internet address. Nebraska could then do its own due diligence. Far too much speech is unnecessarily burdened by the requirement that Doe report his daily business activity to the government.

Second, assume Doe is also a critic of Nebraska's Attorney General. Assume additionally that there is a law professor who maintains a blog to discuss the activities of the various state Attorneys General. The professor calls the blog "Eyes on AGs." On a daily basis, Doe has an interactive exchange, in the comment section of "Eyes on AGs," with adults who discuss their thoughts about Nebraska's Attorney General or some other Attorney General. Every time Doe adds something to the law professor's blog, Doe must tell the Nebraska State Patrol or the local sheriff that he has done so. Again, far too much speech is unnecessarily burdened by the requirement that Doe report to the government his daily political activity on blogs.

To be clear, requiring Internet identifiers and addresses, including designations for purposes of routing or self-identification, as permitted by the federal Attorney General's Guidelines, is one thing.[42] Requiring sex offenders to constantly update the government about when and where they post content to Internet sites and blogs is an entirely different thing. This is true both because the requirement is unnecessarily burdensome and because the requirement is likely to deter the offender from engaging in speech that is perfectly appropriate. *See, e.g.*, *White v. Baker*, 696 F. Supp. 2d 1289, 1310 (N.D. Ga. 2010) (holding that Georgia's blog reporting requirement violated the First Amendment).

One other item is especially worth mentioning. Assistant Attorney General Corey O'Brien was the principal architect of LB 97, and in December 2008, he indicated in an e-mail to Senator Lautenbaugh that although he "would personally like

---

[42] *The National Guidelines for Sex Offender Registration and Notification*, 73 Fed. Reg. 38030-01, at 38055, 2008 WL 2594934 (July 2, 2008).

to prevent [persons with prior sex offenses] from using the internet altogether, that would be unconstitutional.  However, depriving them from accessing certain parts of the internet is perfectly constitutional."  (Ex. 199.)  Given the overly burdensome nature of the Internet and blog-uploading reporting requirement and this e-mail, there is good reason to believe that Nebraska tried to do indirectly what it could not do directly.

Finally, for the reasons I have just expressed, section 29-4006(1)(k) and (s) is plainly overbroad under the First Amendment.  Most offenders are likely to use the Internet whether they are parties to this litigation or not.  Virtually all such offenders are subject to this provision of the law.  Therefore, I declare these provisions of the statute facially unconstitutional.

## C.    *Due Process (Vagueness) Challenge to Section 28-322.05*[43]

A criminal statute fails to comport with due process if the statute "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008); *see also Skilling v. United States*, 130 S. Ct. 2896, 2933 (2010); *Hill v. Colorado*, 530 U.S. 703, 732 (2000); *Grayned v. City of Rockford*, 408 U.S. 104, 108-109 (1972).  "An overly vague statute 'violates the first essential of due process of law,' because citizens 'must necessarily guess at its meaning and differ as to its application'." *United States v. Bamberg*, 478 F.3d 934,

---

[43]Plaintiffs argue in their post-trial brief that section 29-4006(2) is unconstitutionally vague.  (Filing 521 at CM/ECF p. 72.)  However, my prior order limited the outstanding due process vagueness issue to section 28-322.05.  (Filing 354 at CM/ECF pp. 28-34.)  If the plaintiffs intended to bring a due process challenge on vagueness grounds regarding section 29-4006(2), I may have erred in failing to set that matter for trial.  So far as I am concerned, the plaintiffs would not be barred from challenging section 29-4006(2) on due process vagueness grounds in another suit.

937 (8th Cir. 2007) (quoting *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926)).

When a law affects "core First Amendment speech," a law's failure to provide fair notice of what constitutes a violation is "a special concern" because it "inhibit[s] the exercise of freedom of expression and inevitably lead[s] citizens to steer far wider of the unlawful zone . . . than if the boundaries of the forbidden areas were clearly marked." *Stahl v. City of Saint Louis*, 687 F.3d 1038, 1041 (8th Cir. 2012) (finding facially unconstitutional under Due Process Clause city ordinance that prohibited expressive activity that had consequence of impeding pedestrians or vehicular traffic because ordinance failed to provide fair notice of prohibited conduct and excessively chilled protected speech) (internal quotation marks & citation omitted).

> Speech is an activity particularly susceptible to being chilled, and regulations that do not provide citizens with fair notice of what constitutes a violation disproportionately hurt those who espouse unpopular or controversial beliefs. *See NAACP v. Button*, 371 U.S. 415, 433, 83 S. Ct. 328, 9 L. Ed. 2d 405 (1963) ("These freedoms are delicate and vulnerable, as well as supremely precious in our society. . . . Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity.").

*Stahl*, 687 F.3d at 1041-42.

"There is a two-part test to determine whether a statute is void for vagueness. The statute, first, must provide adequate notice of the proscribed conduct, and second, not lend itself to arbitrary enforcement." *United States v. Bamberg*, 478 F.3d at 937. (quoting *Kolender v. Lawson*, 461 U.S. 352, 357 (1983)). *See also* *State v. Rung*, 774 N.W.2d 621, 632 (Neb. 2009) ("The void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement."). "Statutes are to be evaluated under these standards using principles of flexibility and reasonable breadth." *Agena v. Lancaster Cnty. Bd. of Equalization*, 758 N.W.2d 363, 374 (Neb. 2008).

The fact that a court can envision "hypotheticals" and "close cases" does not "render[] a statute vague" because "[c]lose cases can be imagined under virtually any statute. The problem that poses is addressed[] not by the doctrine of vagueness, but by the requirement of proof beyond a reasonable doubt." *Williams*, 553 U.S. at 305-06. Importantly, "[w]hat renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is." *Id*.

As I discussed regarding the plaintiffs' First Amendment challenge, section 28-322.05 is hopelessly indeterminate as to what it prohibits. There is no need to regurgitate the numerous examples of this indeterminacy that I discussed earlier. It is enough to state, by way of reminder, that (1) no one knows what a "collection of web sites" is, and without that understanding, the whole of the Internet could be banned; (2) Mr. Nigam, the defendants' expert and a former prosecutor, did not understand the difference between the words "access or use" set forth in the statute when assessing whether minors were involved with Internet sites, although he assumed that the writer of the statute thought those two words meant different things; and (3) Nigam essentially testified that one would have to rely upon the good faith of prosecutors to cure the vagueness problem inherent in the State's reliance upon a vendor's terms-of-use policy, a policy that might change from moment to moment without notice.

In summary, section 28-322.05 is facially unconstitutional because it is vague under the Due Process Clause.

**D.    *Ex Post Facto* Challenge to Sections 29-4006(1)(k) and (s), 29-4006(2) & 28-322.05**

The next issue for resolution is whether Neb. Rev. Stat. §§ 29-4006(1)(k) and (s), 29-4006(2), and 28-322.05 (West, Operative Jan. 1, 2010), alone or collectively, facially or as applied, violate the *Ex Post Facto* Clause of the United States and Nebraska Constitutions for (1) offenders who had served their time and were no

57

longer under criminal justice supervision on January 1, 2010[44]; and (2) offenders who had been sentenced prior to January 1, 2010, but who remained under criminal justice supervision on or after January 1, 2010.[45]

As I explained in my previous memorandum and order on the parties' motions for summary judgment, "[a] law violates the Ex Post Facto Clause when it applies to events occurring before the law's enactment and the law disadvantages the offender, such as by practically increasing the punishment the offender was subject to on the date of enactment." (Filing 354, CM/ECF p. 13 n.16.) *See* U.S. Const. art. I, § 10, cl. 1; Neb. Const. art. I, § 16. While Plaintiffs challenge the statutes under both the United States and Nebraska Constitutions, I must "undertake only a single analysis because [the Nebraska Supreme Court] ordinarily construes Nebraska's ex post facto clause to provide no greater protections than those guaranteed by the federal Constitution." *Slansky v. Nebraska State Patrol*, 685 N.W.2d 335, 350 (Neb. 2004).

The question whether the statutes at issue "violate[] state and federal constitutional proscriptions against retroactive punishment is analyzed under the U.S. Supreme Court's two-prong, 'intent-effects' test for analyzing punishment." *State v. Worm*, 680 N.W.2d 151, 160 (Neb. 2004) (citing *Smith v. Doe*, 538 U.S. 84 (2003)). Under this test, "[i]f the intention of the legislature was to impose punishment, that ends the inquiry." *Smith*, 538 U.S. at 92. If, however, "a court determines that the Legislature intended a statutory scheme to be civil, that intent will be rejected 'only where a party challenging the [statute] provides the clearest proof that the statutory scheme is so punitive in either purpose or effect as to negate the State's intention.'" *Worm*, 680 N.W.2d at 160 (quoting *State v. Isham*, 625 N.W.2d 511, 515 (Neb. 2001)); *see also* *Doe v. Miller*, 405 F.3d 700, 718 (8th Cir. 2005) (ex post facto

---

[44]This group encompasses all numbered Doe plaintiffs *except* Does 12, 13, 17, 23, and 25. (Tr. 35:7-22.)

[45]This group encompasses Does 12, 13, 17, 23, and 25. (Tr. 35:7-22.)

analysis in case challenging constitutionality of state statute imposing residency restrictions on sex offenders).

Deciding whether a statutory scheme is civil and nonpunitive, as opposed to criminal, "is first of all a question of statutory construction" which requires the court to "consider the statute's text and its structure to determine the legislative objective." *Smith*, 538 U.S. at 92 (internal quotation marks & citations omitted).  This involves considering whether the legislature expressly or impliedly indicated a civil or criminal preference; the manner of statutory codification; the enforcement procedures the statutes establish; and the procedural mechanisms that will implement the statutes. *Smith*, 538 U.S. at 93-96.[46]

If the court decides that the legislature intended to create a civil, nonpunitive statutory scheme, the court must then determine whether the effect of a statute is so punitive as to negate the legislature's intent.  To do so, a court should observe several factors that are neither exhaustive nor dispositive, but rather serve as "useful guideposts." *Smith*, 538 U.S. at 97 (citing *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168-169 (1963)) (internal quotation marks omitted):

> "(1) '[w]hether the sanction involves an affirmative disability or restraint'; (2) 'whether it has historically been regarded as a punishment'; (3) 'whether it comes into play only on a finding of

---

[46]After reviewing the evidence presented on the parties' cross-motions for summary judgment, I previously concluded that "it would be impossible to conclude that the entirety of Nebraska's new legislation was intended to be punitive in nature. In general, the record adequately establishes that Nebraska mainly intended to amend its law to comply with SORNA [the Sex Offender Registration and Notification Act]." (Filing 354 at CM/ECF p. 14 n.17.)  However, I concluded that a trial was necessary with regard to sections 29-4006(1)(k) and (s), 29-4006(2), and 28-322.05 because these provisions are foreign to SORNA; a Nebraska legislator who authored these provisions made comments about his lack of objectivity toward sex offenders; and these provisions are "far[-]reaching and novel." (Filing 354 at CM/ECF p. 13.)

*scienter* '; (4) 'whether its operation will promote the traditional aims of punishment—retribution and deterrence'; (5) 'whether the behavior to which it applies is already a crime'; (6) 'whether an alternative purpose to which it may rationally be connected is assignable for it'; and (7) 'whether it appears excessive in relation to the alternative purpose assigned.'"

*Worm*, 680 N.W.2d at 161 (quoting *State v. Isham*, 625 N.W.2d 511, 515-516 (Neb. 2001), quoting *Hudson v. United States*, 522 U.S. 93 (1997), quoting *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168-169 (1963)); *see also Doe v. Miller*, 405 F.3d at 719 (while *Kennedy v. Mendoza-Martinez* factors are aid to analysis, the "ultimate question always remains whether the punitive effects of the law are so severe as to constitute the 'clearest proof' that a statute intended by the legislature to be nonpunitive and regulatory should nonetheless be deemed to impose *ex post facto* punishment").

Thus, I must decide whether (1) the Nebraska Legislature intended to maintain a civil regulatory scheme in enacting Neb. Rev. Stat. §§ 29-4006(1)(k) and (s), 29-4006(2), and 28-322.05 and, if so, (2) whether the plaintiffs have established by the "clearest proof" that the effects of the statutory language at issue negate the Nebraska Legislature's intent to create a civil, nonpunitive statutory scheme.

I decide that the intent of the Nebraska Legislature was to punish sex offenders, and these laws therefore violate the Ex Post Facto Clause of the United States Constitution, as well as the equivalent Nebraska provision. That is, these laws are facially unconstitutional regarding (1) offenders who had served their time and were no longer under criminal justice supervision on January 1, 2010; and (2) offenders who had been sentenced prior to January 1, 2010, but who remained under criminal justice supervision on or after January 1, 2010.

The statements of the introducer of the bills, coupled with the text, structure, and history of these laws, including the enforcement procedures and the procedural

60

mechanisms that serve to implement the laws, make this evident. Next, I explain this decision in more detail.

First, if I am to do my job as a judge (and particularly as a finder of fact), I must not shrink from the truth. The truth is that the hand-picked introducer of the bill that spawned these extraordinary statutes, acting at the behest of the chief law enforcement officer for Nebraska, the Attorney General, essentially admitted the punitive intent of these provisions. He admitted that he lacked objectivity, and he admitted that he was driven by "rage" at, and "revulsion" for, the sex offenders who were the targets of these extraordinary measures. The senator could not have been more plain.

In this vein, when the plaintiffs sought to depose Nebraska legislators on this very topic, the Nebraska Attorney General's office, the body defending the litigation while at the same time serving as the moving force behind these laws, successfully asserted legislative privileges to thwart the plaintiffs' effort to get at the truth. While the defendants and their lawyers were entitled to invoke these privileges, and while this court was duty-bound to apply the law of privilege, the defendants cannot now claim that the evidence is lacking regarding the true motives of the law-makers. That is, the defendants will not be allowed to use their privilege defenses as both a sword and shield.

Second, the Nebraska Legislature went far beyond its purported purpose of bringing the Nebraska Sex Offender Registration Act into compliance with the federal guidelines created by the Adam Walsh Child Protection and Safety Act of 2006 (P.L. 109-248), otherwise known as the Sex Offender Registration and Notification Act ("SORNA").[47] (Ex. 302, Introducer's Statement of Intent, LB 285 (Mar. 18, 2009).) SORNA requires a person to disclose his or her Internet identifiers and addresses, such as e-mail addresses and instant messaging identifiers, but does not criminalize registrants' use of social networking web sites, instant messaging, or chat rooms, nor

---

[47]SORNA is codified at 42 U.S.C. §§ 16901-16991.

does it require registrants to subject themselves to search and monitoring of their computers and electronic communication devices within their homes, places of employment, and schools.  In addition, once Internet identifiers have been provided, SORNA does not require that offenders tell the government every time the offender uploads content to an Internet site or blog.  While it is true that "SORNA does not bar jurisdictions from adopting additional regulation of sex offenders for the protection of the public, beyond the specific measures that SORNA requires," *The National Guidelines for Sex Offender Registration and Notification*, 73 Fed. Reg. 38030-01, at 38034, 2008 WL 2594934 (July 2, 2008) (Ex. 303), if the Nebraska Legislature's intent was mere compliance with a civil regulatory scheme, these broad, additional, and oppressive *criminal* provisions would not have been included.

Third, the impact of these statutes is to impose what is essentially a long-term, and, in some cases, a life-term, period of "supervised release" that would be right at home in a typical federal judge's *criminal sentence* for a sex offense.  Many offenders are prohibited from using enormous portions of the Internet upon pain of a jail or prison sentence.[48]  All offenders who use the Internet must tell the government any time they post information to an Internet site or a blog, and the failure to do so is a felony.[49]  All offenders who use the Internet must "consent" to the search of their

---

[48]A violation of section 28-322.05(1) (the "social networking" crime) is a misdemeanor for the first offense and a felony for the second offense.  Neb. Rev. Stat. § 28-322.05(2).

[49]The failure to provide or update the information required by section 29-4006(1)(k) and (s) or to provide the "consent" form required by Neb. Rev. Stat. § 29-4006(2) violates § 29-4006(10).  In turn, a violation of § 29-4006 is a crime.  Neb. Rev. Stat. § 29-4011(1) ("Any person required to register under the Sex Offender Registration Act who violates the act is guilty of a Class IV felony.")  Such a felony is punishable by imprisonment of up to five years and a fine of up to $10,000.  Neb. Rev. Stat. § 28-105(1) (West 2009).

computers whether at home or otherwise, and they must also "consent" to the installation of monitoring equipment—the failure to do so is a felony.[50]

There are, of course, two important differences between a federal judge's imposition of a term of supervised release and Nebraska's scheme.  In Nebraska's scheme, the offender has no impartial judge determining the need for the conditions, and in Nebraska the offender has no impartial judge monitoring the administration of the conditions.  Under Nebraska's scheme, those things are done by law enforcement agents.  Furthermore, once a federal offender has done his or her time and served his or her term of supervised release, the offender does not need to fear that the offender will be subjected anew to those restrictive conditions and criminal sanctions unless the offender violates the law again.

Fourth, and finally, these statutes are rife with other constitutional infirmities, and the blatant willingness of the Nebraska Legislature to violate the Constitution is strong evidence of animus.  These laws gut the First and Fourth Amendment and the Due Process Clause.  These statutes *retroactively* render sex offenders, who were sentenced prior to the effective date of these statutes, second-class citizens.  They are silenced.  They are rendered insecure in their homes.  They are denied the rudiments of fair notice.  In Nebraska's "rage" and "revulsion," they are stripped of fundamental constitutional rights.   In short, sex offenders who were sentenced prior to the enactment of these laws are punished.

### E.     Doe 24's Fourth Amendment "As-Applied" Challenge to Section 29-4006(2)

*If I have jurisdiction to do so*, I must determine the constitutionality of the consent-to-search and consent-to-monitoring provisions of Neb. Rev. Stat. § 29-4006(2) under the Fourth Amendment and the equivalent provision of the

---

[50]*See supra* note 49.

Nebraska Constitution as applied to Doe 24.[51]  Upon providing certain identifying information related to their electronic communications, section 29-4006(2) requires sex-offender registrants to consent to the "[s]earch of all the computers or electronic communication devices possessed by the person" and the "[i]nstallation of hardware or software to monitor the person's Internet usage on all the computers or electronic communication devices possessed by the person."

The plaintiffs "concede that they do not have standing to bring a claim for those on probation or supervised release; further, they concede that this provision could be applied constitutionally to a parolee subject to different terms of parole.  However, the plaintiffs argue, because Doe 24 has an expectation of privacy as it relates to general law enforcement, Neb. Rev. Stat. § 29-4006(2) should be held to be unconstitutional as applied to him and those similarly situated."  (Filing 521 at CM/ECF p. 48.)  In other words, section 29-4006(2) allows searches and monitoring by general law enforcement personnel, but Doe 24's terms of parole limit such searches and monitoring to those performed only by parole officers and/or personnel of the Parole Administration.[52]  (Filing 521 at CM/ECF p. 50.)

---

[51]As described in more detail above, I have already "decided that on Fourth Amendment grounds and the equivalent provision of the Nebraska Constitution, Neb. Rev. Stat. § 29-4006(2) is unconstitutional as it regards Plaintiffs who were previously convicted of sex crimes but who were not on probation, parole or court-monitored supervision on or after January 1, 2010."  (Filing 354 at CM/ECF p. 27.)  In this opinion, I have also decided that the statutory triggering mechanism for the search-and-monitoring conditions—the provision of e-mail addresses and the like as required by § 29-4006(1)(k) and (s)—is unconstitutional under the First Amendment and Ex Post Facto Clause.

[52]As stated in the Findings of Fact above, Doe 24's conditions of parole require him to "obey all . . . laws, ordinances and orders" and to "permit [his] parole officer and/or personnel of Parole Administration to conduct routine searches of [his] person, residence, vehicle or any property under [his] control, at such times as they deem necessary."  (Filing 522, Defs.' Post-Trial Br. at CM/ECF pp. 33, 42; Filing 521, Pls.' Closing Arg. Br. at CM/ECF pp. 5, 48-51; Filing 495, Defs.' Pretrial Br. at CM/ECF

Relying on *Samson v. California*, 547 U.S. 843 (2006), the defendants contend that Doe 24, by virtue of his conditions of parole, is "already subject to a much-broader search and monitor provision" than that provided in section 29-4006(2); that Doe 24 "has no expectation of privacy entitled to protection under the Fourth Amendment throughout the duration of his parole"; and therefore, the court should reject the plaintiffs' Fourth Amendment challenge to Neb. Rev. Stat. § 29-4006(2). (Filing 522 at CM/ECF pp. 42-43.)

> In every Fourth Amendment case, courts must balance the competing values. On the one hand, we jealously guard privacy and our citizens' right to be free from unreasonable government intrusion. While on the other, we encourage zealous law enforcement to ensure our citizens can safely enjoy their liberties. Accordingly, to determine whether the Fourth Amendment forbids a search, we weigh the degree to which a search intrudes upon an individual's reasonable expectation of privacy against the degree to which the government needs to search to promote its legitimate interests.

*United States v. Brown*, 346 F.3d 808, 811 (8th Cir. 2003).

In *United States v. Knights*, 534 U.S. 112, 119-21 (2001), the Supreme Court noted that probationers "do not enjoy the absolute liberty to which every citizen is entitled," but instead are subject to "a form of criminal sanction imposed by a court" that is "one point . . . on a continuum of possible punishments." *Id*. at 119 (internal quotation marks & citations omitted). In *Samson*, the Court found that parolees, like Doe 24, are on that same "continuum" with even "fewer expectations of privacy than probationers, because parole is more akin to imprisonment than probation is to imprisonment." *Samson*, 547 U.S. at 850 ("The essence of parole is release from

---

p. 38; Tr. 450:15-24 & Ex. 210.) However, Doe 24 is not subject to the special condition of parole that would have required Doe 24 to "consent to unannounced examination (search) of any and all computer(s) and/or devices to which you have access to." (Ex. 210 at p. 6.)

65

prison, before the completion of sentence, on the condition that the prisoner abide by certain rules during the balance of the sentence.") (internal quotation marks & citation omitted).  Further, when a probationer or parolee "consents to a search condition, his already-reduced reasonable expectation of privacy diminishes significantly." *Brown, 346 F.3d at 811*; *Samson, 547 U.S. at 852* (petitioner's status as parolee and terms of parole search condition led Court to conclude that petitioner did not have expectation of privacy that society would recognize as legitimate).

No one argues that the State does not have an "overwhelming interest" in supervising parolees, in reducing recidivism, and in promoting "reintegration and positive citizenship among probationers and parolees," *Samson, 547 U.S. at 853*, or that the State has a significant, even compelling, government interest in protecting minors online from sex offenses.[53]  But that governmental interest is tempered by the Fourth Amendment, which protects parolees under certain circumstances.

Indeed, there may be a big problem for the State.  That problem is represented by *United States v. Freeman, 479 F.3d 743 (10th Cir. 2007)*.  There, Judge McConnell, writing for the Tenth Circuit, decided that the search of a parolee's residence by ordinary city police officers, when the parole agreement allowed such searches only by parole officers, was impermissible under the Fourth Amendment.  Essential to the *Freeman* holding were the Kansas Department of Corrections policy statements that provided, "with the exception of pat-down and plain view searches, special enforcement officers are the only personnel authorized to conduct a more extensive search of offenders' person or property" and that permitted warrantless searches only

---

[53]*See* Neb. Rev. Stat. § 29-4002 ("The Legislature finds that sex offenders present a high risk to commit repeat offenses.  The Legislature further finds that efforts of law enforcement agencies to protect their communities, conduct investigations, and quickly apprehend sex offenders are impaired by the lack of available information about individuals who have pleaded guilty to or have been found guilty of sex offenses and who live, work, or attend school in their jurisdiction.").

when the special enforcement officer had reasonable suspicion of a parole condition violation.  *Id.* at 744, 747-48.  The *Freeman* court stressed that  "[p]arolee searches are therefore an example of the rare instance in which the contours of a federal constitutional right are determined, in part, by the content of state law." The court also observed that *Samson* approved the constitutionality of general law enforcement officers' warrantless parolee searches without reasonable suspicion "only when authorized under state law." *Id.*

In reviewing Doe 24's challenge, I am confronted by the following four uncertainties: (1)  Doe 24 may never face the threat of a search and the installation of monitoring hardware and software under § 29-4006(2) because the triggering mechanism—§ 29-4006(1)(k) and (s)—has been declared unconstitutional on grounds other than the Fourth Amendment; (2) Doe 24's parole may expire before these issues are finally resolved on appeal, and, if so, Doe 24's expectation of privacy would be different; (3) as the *Freeman* court noted, Doe 24's parole conditions, as they relate to his Fourth Amendment challenge, require a construction of *state law*; and (4) there is no authoritative construction of state law, such as the Kansas policy statements in *Freeman*, upon which I can rely to understand the reach of Doe 24's parole conditions, and I have no jurisdiction in this case to tell the Nebraska Parole Board what those parole conditions mean.

These contingencies force me to question whether Doe 24's challenge is "ripe." Critically, "ripeness" is a necessary component for Article III jurisdiction:

> "Standing and ripeness are sometimes closely related.  In assessing ripeness, we focus on whether the case involves 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Missouri Roundtable for Life v. Carnahan*, 676 F.3d 665, 674 (8th Cir. 2012) (quoting *Care Committee v. Arneson*, 638 F.3d 621, 631 (8th Cir. 2011), other citation omitted).  Both are requirements for Article III subject matter jurisdiction.  *Care Committee*, 638 F.3d at 627.

*Kennedy v. Ferguson*, 679 F.3d 998, 1001 (8th Cir. 2012) (under Arkansas law, as predicted by Court of Appeals, statute of limitations governing challenges that could be brought at any time prior to final distribution of probate estate based on discovery of another will applied to legatee's lawsuit claiming legal malpractice and constructive fraud against attorney who drafted two wills for legatee's father, even though legatee's challenge to validity of first will was supported by mere copy of newly-discovered second will, and thus, legatee's lawsuit was not ripe under Article III requirements, as legatee's challenge could have been raised in probate that had not closed, so any cognizable injury to legatee from prospective final distribution of estate was as yet unknown).

"The ripeness doctrine is aimed at preventing federal courts, through premature adjudication, from 'entangling themselves in abstract disagreements.'" *Wersal v. Sexton*, 674 F.3d 1010, 1018 (8th Cir. 2012) (en banc) (judicial office candidate's First Amendment challenge to clause of Minnesota code of judicial conduct prohibiting judicial candidate from soliciting funds for political organizations or candidates was not ripe; candidate only sought to solicit funds for his own campaign committee, which he was permitted to do under the code, and not for another's campaign or himself personally, and therefore candidate could not show there was likelihood he would face sanctions for engaging in desired conduct) (quoting *Citizens for Equal Prot. v. Bruning*, 455 F.3d 859, 863 (8th Cir. 2006), in turn quoting *Thomas v. Union Carbide Agr. Prods. Co.*, 473 U.S. 568, 580, 105 S. Ct. 3325, 87 L. Ed. 2d 409 (1985)).

After careful consideration, I decide that Doe 24's "as-applied" Fourth Amendment challenge to § 29-4006(2) is not "ripe" and must be dismissed for lack of Article III jurisdiction. The four "uncertainties" that I outlined earlier convince me that Doe 24's challenge involves contingent future events that may not occur as anticipated, or indeed may not occur at all; that Doe 24's challenge is premature; and that if I

68

assumed jurisdiction, I would be entangling the court in the resolution of an abstract question.[54]

## IV.  CONCLUSION

For the sake of clarity, I now provide a summary of the rulings I have made earlier and the rulings that I have made in this opinion.  The following summary is drawn from my earlier decision on the motions for summary judgment (Filing 354) and this decision:

* Except as noted below, the new Nebraska laws that were enacted by LB 97 (2009) and LB 285 (2009) are constitutional.

* Doe 24's Fourth Amendment "as-applied" challenge to Neb. Rev. Stat. § 29-4006(2) is not ripe.

* Save for Doe 24's "as-applied" challenge to § 29-4006(2), Neb. Rev. Stat. §§ 29-4006(1)(k) and (s), 29-4006(2), and 28-322.05 are unconstitutional,

---

[54]Therefore, any as-applied Fourth Amendment challenge to Neb. Rev. Stat. § 29-4006(2) asserted by persons associated with Doe 24 is also not ripe.  However, my earlier decision finding the statute *facially* unconstitutional as to previously convicted sex offenders who were not on probation, parole, or court-monitored supervision on or after January 1, 2010, stands.  The statute is facially unconstitutional because there is no set of circumstances under which the statute would be valid as to those individuals.  *United States v. Salerno*, 481 U.S. 739, 745 (1987).  Essentially, the defendants' affirmative defense to Doe 24's claim is that the parole conditions reduce his reasonable expectation of privacy and therefore the statute, even if otherwise unconstitutional as to everyone else, may survive as to Doe 24.  That defense is *external* to the facial validity of the statute and turns on an interpretation of state law that I do not have jurisdiction to make.  As a result, the defendants cannot assert that facial invalidation of this statute is prohibited under *Salerno*.

both facially and as applied to some of the plaintiffs.[55]  As indicated in my decision on the motions for summary judgment, Neb. Rev. Stat. § 29-4006(2) is unconstitutional under the Fourth Amendment as to those plaintiffs who were previously convicted of sex crimes, but who were not on probation, parole, or court-monitored supervision on or after January 1, 2010.  Neb. Rev. Stat. §§ 29-4006(1)(k) and (s) and 28-322.05 are unconstitutional under the First Amendment.  Neb. Rev. Stat. § 28-322.05 is unconstitutional under the Due Process Clause.  Neb. Rev. Stat. §§ 29-4006(1)(k) and (s), 29-4006(2), and 28-322.05 are unconstitutional under the Ex Post Facto Clause.

Lastly, I compliment all the lawyers for their professionalism and civility.  At the initial stages of this litigation, I found Mr. David Cookson, Nebraska's Chief Deputy Attorney General, to have been especially persuasive, candid, and helpful.  I should also single out the lead lawyers for the plaintiffs.  Mr. Stuart Dornan, a former FBI agent and a former County Attorney for Douglas County, Nebraska (Omaha), and Mr. Thomas Monaghan, a former United States Attorney for the District of Nebraska, took the plaintiffs' case despite the fact the plaintiffs are viewed as lepers by many Nebraskans.  By taking this case, both men were sure to displease and disappoint their former law-enforcement friends and colleagues.  The decision to represent these unpopular plaintiffs took courage and is an example of the highest traditions of the bar of this court.

Accordingly,

IT IS ORDERED that:

---

[55]The plaintiffs who succeed on their "as-applied" challenges are set forth in the "order" portion of this document.

1.    The Clerk of Court shall upload Court's Exhibit 1 to CM/ECF as a restricted document.

2.    Except as noted below, the Nebraska laws that were enacted by LB 97 (2009) and LB 285 (2009) are constitutional.

3.    Neb. Rev. Stat. §§ 28-322.05 and 29-4006(1)(k) and (s) (West, Operative Jan. 1, 2010) are facially unconstitutional under the First Amendment and the equivalent Nebraska constitutional provision.

4.    Neb. Rev. Stat. § 28-322.05 (West, Operative Jan. 1, 2010) is facially unconstitutional under the Due Process Clause and the equivalent Nebraska constitutional provision.

5.    Neb. Rev. Stat. §§ 29-4006(1)(k) and (s), 29-4006(2), and 28-322.05 (West, Operative Jan. 1, 2010) are facially unconstitutional under the Ex Post Facto Clause of the United States Constitution and the equivalent Nebraska constitutional provision regarding (a) offenders who had served their time and were no longer under criminal justice supervision on January 1, 2010; and (b) offenders who had been sentenced prior to January 1, 2010, but who remained under criminal justice supervision on or after January 1, 2010.

6.    Neb. Rev. Stat. §§ 29-4006(1)(k) and (s) and 29-4006(2) (West, Operative Jan. 1, 2010) are unconstitutional as applied to all those Plaintiffs listed on Court's Exhibit 1 who are identified therein as "presently a Plaintiff" and who must register as a sex offender under the Nebraska Sex Offender Registration Act, Neb. Rev. Stat. §§ 29-4001 to 29-4014.

71

7.     Neb. Rev. Stat. § 28-322.05 (West, Operative Jan. 1, 2010) is unconstitutional as applied to Does 2, 3, 4, 6, 12, 13, 17, 18, 19, 27, and 35.[56]

8.     As indicated in my decision on the motions for summary judgment (Filing 354), Neb. Rev. Stat. § 29-4006(2) (West, Operative Jan. 1, 2010) is unconstitutional under the Fourth Amendment as to those plaintiffs who were previously convicted of sex crimes, but who were not on probation, parole, or court-monitored supervision on or after January 1, 2010.  Doe 24's as-applied challenge to Neb. Rev. Stat. § 29-4006(2) under the Fourth Amendment and the equivalent Nebraska constitutional provision is not ripe and is therefore dismissed for lack of Article III jurisdiction.

9.     The claims of the plaintiffs who are not required to register as sex offenders are dismissed without prejudice as moot.

10.     The claims of the plaintiffs who are shown on Court's Exhibit 1 to have withdrawn from participation in this lawsuit are dismissed without prejudice.

11.     Final judgment will be withheld pending resolution of the attorney fee issue.

12.     Counsel for the plaintiffs shall have until November 1, 2012, to submit an application, evidence, evidence index, and brief regarding attorney fees.  Counsel for the defendants shall have until November 16, 2012, to respond with evidence, evidence index, and brief.  Both sides shall give due attention to the local rules of practice regarding attorney fee applications.  Counsel are also encouraged to settle the attorney fee issue, if they can, recognizing that the plaintiffs have been partially, but not wholly, successful.

---

[56]These are the plaintiffs (except Doe 24) who counsel stipulated are required to register under the Nebraska Sex Offender Registration Act because of a conviction for one or more of the offenses enumerated in Neb. Rev. Stat. § 28-322.05(1)(a)-(k).

72

DATED this 17th day of October, 2012.

> BY THE COURT:
>
> *Richard G. Kopf*
>
> Senior United States District Judge

---

*This opinion may contain hyperlinks to other documents or web sites. The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their web sites. Likewise, the court has no agreements with any of these third parties or their web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.